**WEST VALLEY CITY CORPORATION, a Utah municipal corporation, Plaintiff and Appellant,**

v.

**SALT LAKE COUNTY, Arthur L. Monson, Salt Lake County Treasurer, and Salt Lake County Municipal Type Service District No. 1, Defendants and Appellees.**

**HERCULES INCORPORATED, Plaintiff,**

v.

**SALT LAKE COUNTY, Arthur L. Monson, Salt Lake County Treasurer, and Salt Lake County Municipal Type Service District No. 1, Defendants.**

No. 900542.

Supreme Court of Utah.

May 10, 1993.

Paul T. Morris, Gary R. Crane, West Valley, for appellant.

Karl L. Hendrickson, David E. Yocom, Bill Thomas Peters, Salt Lake City, for appellees.

ZIMMERMAN, Justice:

West Valley City appeals from a district court order denying its motion for summary judgment and granting summary judgment in favor of Salt Lake County. The trial court's ruling permitted the County's municipal-type service district to retain 1988 ad valorem property taxes collected from the owners of property that was annexed to and served by West Valley during 1988. We reverse the district court and direct entry of judgment for West Valley.

The material facts are not in dispute. On March 31, 1988, West Valley annexed approximately 4600 acres of unincorporated real property from the County.[1] Prior to annexation, the property had been part of Salt Lake County's Municipal-type Service District No. 1. *See* Utah Code Ann.

---

1. The property is owned by Hercules Corpora- tion.

§§ 17–34–1, –2.[2] Following annexation, West Valley assumed responsibility for providing municipal services to the annexed area. Despite this fact, the service district levied ad valorem taxes on the annexed property for the entire year.[3] *See id.* § 17–34–3.[4] The county treasurer then collected and distributed those taxes to the service district. West Valley requested a remittance of those taxes, but the County denied the request.

West Valley then brought this action in district court.[5] Both parties filed motions for summary judgment, and on September 10, 1990, the court denied West Valley's motion and granted the County's, finding that West Valley was not entitled to the taxes because it had failed to notify the state tax commission of the March 31, 1988, annexation on or before December 31, 1987, as required by section 11–12–3 of the Code. *See id.* § 11–12–3. West Valley appeals.

When no facts are in dispute, a challenge to a summary judgment presents for review only conclusions of law. *See* Utah R.Civ.P. 56(c); *Schurtz v. BMW of N. Am., Inc.,* 814 P.2d 1108, 1111 (Utah 1991). We accord no deference to a trial court's legal conclusions but review them for correctness. *Schurtz,* 814 P.2d at 1112.

This case turns on the interpretation to be given section 11–12–3 of the Code, which provides:

> Property annexed to any existing taxing entity or property in any new taxing entity shall carry any tax rate imposed by that taxing entity if notification, as required by Section 11–12–1, is made to the State Tax Commission not later than December 31 of the previous year.

Utah Code Ann. § 11–12–3.[6] The County argues that because West Valley did not

---

**2.** Section 17–34–1 provides:

> The purpose of this act is to allow counties of the first and second class to furnish municipal-type services and functions to areas of the county outside of incorporated towns or cities and defray the cost by levying taxes on taxable property in the county outside the limits of incorporated towns or cities or by charging a service charge or fee to persons benefiting from the services and functions.

Utah Code Ann. § 17–34–1.

Section 17–34–2 provides:

> Counties may provide to the areas of the county outside the limits of any incorporated cities or towns the following municipal-type services or functions without providing the same services or functions to incorporated cities or towns: fire protection, waste and garbage collection and disposal, planning and zoning, street lighting, and all other services or functions that are required by law to be budgeted, appropriated, and accounted for from either a municipal services fund or a municipal capital projects fund as defined under Chapter 36, Title 17.

Utah Code Ann. § 17–34–2.

**3.** The County assessed a tax rate for municipal services of .002109 per dollar of assessed value.

**4.** Section 17–34–3 provides, in relevant part:

> (1) Whenever a county furnishes the municipal-type services and functions described in § 17–34–2 of this chapter to areas of the county outside the limits of incorporated cities or towns, the entire cost of the services or functions so furnished shall be defrayed from funds that the county has derived from either (a) taxes which the county may lawfully levy

or impose outside the limits of incorporated towns or cities, or (b) service charges or fees the county may impose upon the persons benefited in any way by the services or functions, or (c) a combination of these sources. As the taxes or service charges or fees are levied and collected, they shall be placed in a special revenue fund of the county and shall be disbursed only for the rendering of the services or functions established in § 17–34–2 within the unincorporated areas of the county.

> (2) For the purpose of levying taxes, services charges, or fees provided in this section, the county commission may establish a district or districts in the unincorporated areas of the county.

Utah Code Ann. § 17–34–3.

**5.** Hercules also filed suit against the County in state court after paying the taxes at issue under protest. Hercules' action was consolidated with that of West Valley. The trial court found that Hercules was not entitled to a refund for the difference in ad valorem taxes between the amount it had paid to the County's service district and the amount it would have paid West Valley for the 1988 tax year. Hercules, however, has not joined this appeal, and we do not address this issue.

**6.** Section 11–12–1 provides:

> No county service area, special purpose district, city, or town may be incorporated, established, or the boundaries modified, without a notification of the change being filed with the State Tax Commission within ten days after the conclusion of the proceedings in connection with the change.

notify the state tax commission of the annexation before December 31, 1987, some three months before it occurred, the property in the annexed area must carry the County's tax rate for all of 1988 and the County is entitled to all the taxes that rate generated. On the other hand, West Valley claims that section 11–12–3 specifies only the tax rate to be applied to annexed or newly incorporated property and is of no consequence in determining which entity is entitled to the revenues generated by that rate.

■ In deciding a statute's meaning, we first consider its terms. Only if the statute is ambiguous need we look further. *Schurtz*, 814 P.2d at 1112. Here, there is no ambiguity. The statute states that when property is annexed, it "shall carry any tax rate" of the annexing entity *if* the state tax commission is notified of the annexation and the relevant tax rate by December 31st of the previous year. Utah Code Ann. § 11–12–3. The statute does not purport to speak to the question of which entity is entitled to the tax revenue. Here, because West Valley did not notify the state tax commission of the annexation by December 31, 1987, the statute requires that the tax rate applicable to this property for 1988 be that of the County.

■ Because section 11–12–3 does not address the question of who receives the resulting tax revenue, we look to other sources. In *Huntington City v. Peterson*, 518 P.2d 1246, 1249 (Utah 1974), we held that the date of assessment and levy, not the statutory lien date of January 1st, is the relevant date for determining whether property is within the reach of a taxing entity's power for the purpose of assessing, levying, and collecting taxes on the property. *See also Utah Parks Co. v. Iron County*, 380 P.2d 924, 925–26 (Utah 1963);

*Gillmor v. Dale*, 27 Utah 372, 75 P. 932, 934 (1907). *Huntington* leads us to conclude that although the date for fixing the tax rate may be December 31, 1987, and the lien date may be January 1, 1988, the levy date of June 22, 1988, is the relevant point for determining whether West Valley or the County should receive the ad valorem taxes for the entire 1988 tax year.[7] *See* Utah Code Ann. § 59–2–912. In essence, the entity within which the property lies on the date the levy for the taxable year occurs is entitled to receive the taxes for the entire year. Because annexation of the property was complete as of March 31, 1988, we hold that West Valley is entitled to the taxes for the 1988 tax year.

The County claims that such a holding violates article XIII, sections 2 and 3 of the Utah Constitution, which, the County contends, require that all property within a municipality be taxed at a uniform and equal rate. The County argues that if West Valley is allowed to recover the ad valorem taxes, it will have effectively imposed two different tax rates on property within its boundaries during 1988, in violation of the constitution. On the other hand, West Valley argues that to rule against it would violate article XIII, section 10 of the Utah Constitution, which provides:

> All corporations or persons in this State, or doing business herein, shall be subject to taxation for State, County, School, Municipal or other purposes, on the real and personal property owned or used by them within the Territorial limits of the authority levying the tax.

Utah Const. art. XIII, § 10. West Valley contends that this provision requires that all owners of property within its boundaries are subject to paying it taxes, something the trial court's ruling would bar.

The notice shall include an ordinance or resolution with a map or plat that delineates a metes and bounds description of the area affected and evidence that the information has been recorded by the county recorder. The notice shall also contain a certification by the officers of the county service area, special purpose district, city, or town that all the necessary legal requirements relating to incor-

poration, establishment, or modification have been completed.

Utah Code Ann. § 11–12–1.

7. See 62 C.J.S. *Municipal Corporations* § 79 (1949 & Supp.1992), for the proposition that taxes assessed on annexed property belong to the annexing city in the absence of a specific statutory provision indicating otherwise.

If both constitutional arguments were accepted, a decision in favor of either party would necessarily create a constitutional violation. We think, however, that both parties read more into these constitutional provisions than is appropriate. These provisions mean exactly what they say, but none seems to have been drafted in contemplation of the problems that can arise when property is shifted from one taxing jurisdiction to another, much less if such a shift occurred in the midst of the process of determining rates and fixing liability for taxes. Each provision states a principle that seems to speak to different times during the tax year. All are silent as to how to deal with a situation such as the present one.

■■■ Sections 2 and 3 of article XIII, relied on by the County, refer to the tax rate imposed. Section 2(1) provides:

All tangible property in the state, not exempt under the laws of the United States, or under this Constitution, shall be taxed at a uniform and equal rate in proportion to its value, to be ascertained as provided by law.

Utah Const. art. XIII, § 2(1). Section 3(1) provides in part:

The Legislature shall provide by law a uniform and equal rate of assessment on all tangible property in the state, according to its value in money, except as otherwise provided in Section 2 of this Article.

Utah Const. art. XIII, § 3(1). Taken together, these provisions articulate the principle that uniform rates of taxation are to be employed but confer on the legislature the power to implement that principle. *Cf. Rio Algom Corp. v. San Juan County,* 681 P.2d 184, 190–91 (Utah 1974). As noted above, these provisions do not fix the point during the year when their principles are to be satisfied. The legislature has filled this lacuna by setting a uniform date of lien, January 1st. Utah Code Ann. § 59–2–103. We conclude that the requirement of uniform and equal rates of assessment is to be judged as of that date. Because the actual tax rates imposed were uniform and equal as of January 1, 1988, we find no constitutional violation.

■■■ As for West Valley's reliance on article XIII, section 10, it too states a principle that can be tested sensibly only at a given point each year. The movement of property from one legal entity to another during the year necessarily precludes the provision from being satisfied at all times. However, because this constitutional provision refers to *levying* taxes, we think that the date of levy, not the statutory lien date, is the appropriate date at which to look in determining whether the provision has been met. Section 10 requires that the entity within which the property is located as of the levy date receive the taxes for that year. Here, the property was not within the County's boundaries on June 22, 1988, by virtue of its annexation to West Valley on March 31st, and therefore, the County was not entitled to the revenues collected for the 1988 tax year. *See Huntington City,* 518 P.2d at 1248–49. By awarding the taxes to West Valley, all property could be taxed by the entity within which it lay, thus satisfying article XIII, section 10, even though the rates used might include rates fixed by another entity as of January 1st.

We note that both West Valley and the County have raised policy arguments to support their respective positions. Each claims that if we decide for the other, administrative and fiscal hardships will be imposed upon them. We recognize that under our decision today, anomalous results are possible. For example, if annexation occurs after the June 22nd levy date, the acquiring entity would receive no ad valorem tax dollars from that property for the entire year despite the fact that that entity would be required to provide services immediately upon annexation. On the other hand, if the annexation occurs on or before June 22nd, the entity from which the property was annexed would be denied any tax revenues for the year despite the fact it had provided services for some period of time during the year.

These apparent inequities flow from the fact that the time when levy occurs, like

the time for fixing the applicable tax rate, has no necessary relationship to the date on which an annexation or incorporation becomes final. Certainly, it is within the power of the legislature to adjust the operation of these various statutes and their interplay with annexations and incorporations so as to ameliorate these problems. But the fact that this interplay has not been rationalized at present does not argue against the disposition we have made of this appeal; it argues only for legislative attention to the matter.

The judgment of the district court is reversed, and the case is remanded with directions to enter judgment for West Valley.

HALL, C.J., STEWART and DURHAM, JJ., concur.

HOWE, Associate Chief Justice (dissenting):

I dissent. I cannot agree with the majority's interpretation of section 11–12–3 that requires District No. 1 to turn over to West Valley City tax revenues which the District has lawfully levied and collected. That interpretation is without precedent and ignores the administrative interpretation that the Utah State Tax Commission has given the statute for over twenty-five years.

It is clear to me that the intent of section 11–12–3 is that when property is annexed to an existing taxing entity, the new entity can tax it at its rate if the notice of annexation required by section 11–12–1 has been given by December 31 of the prior year. Conversely, if notice has not been given by December 31, the property remains taxable by the former entity at its rate. The statute was drawn in recognition of the fact that (1) taxes are assessed, levied, and collected on a calendar-year basis and (2) for purposes of taxation, boundaries of taxing entities are fixed as of January 1. The majority, however, finds a void in the statute in that it does not "speak to the question of which entity is entitled to the tax revenue." The majority then concludes that although notification was not given by December 31 and the property remains taxable by the former entity (District No. 1) at its rate, the proceeds belong to the new entity (West Valley City). I cannot agree.

It seems elementary that when the legislature authorizes an entity to impose a tax, the proceeds from taxation should belong to that entity unless the legislature has made an exception. No statutory exception has been cited by West Valley or the majority, nor have I been able to find any. Nevertheless, the majority requires the former entity (District No. 1) to disgorge the proceeds of a tax it lawfully imposed and give them to the new entity (West Valley) because the property had been annexed to West Valley before the levy date of June 22. As its sole authority for that holding, the majority relies on *Huntington City v. Peterson*, 30 Utah 2d 408, 518 P.2d 1246 (1974), and concludes that "the date of assessment and levy, not the statutory lien date of January 1st, is the relevant date for determining whether property is within the reach of a taxing entity's power for the purpose of assessing, levying, and collecting taxes on the property."

*Huntington City* obviously dealt with a far different question than the one before us here. There, Huntington City purchased a tract of land on April 7, 1959. Under article XIII, section 2 of the Utah Constitution, land owned by a city is exempt from taxation. The question arose whether taxes could be lawfully levied on the land since it was privately owned on January 1, 1959, when the tax lien attached. This court held that because the city had acquired the property prior to the levy of taxes made in August of 1959, the property should not have been taxed and that the city was entitled to its exemption for 1959.

Clearly, that case has no application in the instant case. We are not concerned here with a tax exemption. The property here is admittedly taxable. The only questions are, who can tax the property, and who is entitled to the tax proceeds? *Huntington City* sheds no light on these questions.

West Valley contended in the trial court, and now contends in this court, that it had

the constitutional and statutory right to tax the annexed land for 1988. Yet it made no attempt to tax it in 1988. To the contrary, the county auditor notified West Valley on or about June 1, 1988, of the total assessed valuation of property within West Valley City, pursuant to section 59–2–924, and that the value of the property here annexed on March 30 was not included in that total. Yet West Valley then did not protest or claim that it should be allowed to tax the property. It did not bring legal action then. It was content to allow District No. 1 to levy and collect the tax, and it was not until October 28, 1988 (just one month before the taxes became delinquent), that West Valley made its first formal demand on District No. 1 for the taxes about to be collected. If West Valley thought that it was entitled to tax the property, it should have brought legal action early on to prevent the District from taxing it. But it did not do so.

The majority impliedly rejects West Valley's contention that it had the constitutional and statutory right to tax the property. Indeed, under our statutory timetable for assessing, levying, and collecting taxes, §§ 59–2–301 to –330, there was no way West Valley could tax property in 1988 which it did not annex until March 30 of that year. Nevertheless, the majority holds that West Valley is entitled to the tax revenues because the property was in West Valley on the date the levy was made, not by West Valley, but by the District. I do not follow that reasoning, and I cannot agree with that result.

I know of no precedent whereby this court can by judicial fiat take taxes levied and collected by one taxing entity and give them to another entity. The Utah Constitution authorizes revenue sharing in article XIII, section 5, only when provided by statute. That section provides in part:

Notwithstanding anything to the contrary contained in this Constitution, political subdivisions may share their tax and other revenues with other political subdivisions *as provided by statute.*

(Emphasis added.)

The majority has cited no statute, and I have not been able to find one, which au-

thorizes the sharing of tax revenue here ordered by the majority. In fact, the statutes authorizing the creation of municipal-type service districts prohibit it.

As the taxes or service charges or fees are levied and collected, they shall be placed in a special revenue fund of the county and shall be disbursed *only for the rendering of the services or functions established in Section 17–34–2 within the unincorporated areas of the county.*

Utah Code Ann. § 17–34–3(1) (emphasis added).

In a perfect world, each taxing entity would tax the property for that part of the year in which the property was included in the entity. Our statutory taxation framework, however, does not allow for any such division. Instead, our legislature has established a framework in which taxes are assessed, levied, and collected according to the situs of the property on January 1 of each year. This statutory scheme may create some inequities as the majority points out. However, the inequity is not solved by the majority's decision, which leaves the former entity without any revenue to cover that part of the year in which it rendered services to the annexed area. The legislature, in section 11–12–3, has spoken on this matter and has provided that when boundary changes are made after December 31, the property shall remain taxable for that year in the former entity and shall bear the former entity's tax rate. It was unnecessary for the legislature to affirmatively state that the taxing entity would be entitled to the revenue since tax revenues belong to the entity imposing them unless the legislature has otherwise provided. Moreover, if section 11–12–3 creates a hardship on an annexing city, the city can always delay the annexation until close to the end of the year and avoid the hardship.

The majority has failed to mention or to give any weight to the historical administrative interpretation given section 11–12–3 by the Utah State Tax Commission, which administers property tax assessment, levying, and collection in this state. Ever since

section 11-12-3 was enacted in 1963, the tax commission has consistently interpreted that section to allow the former entity to tax and retain the revenues collected where the boundary had been changed after December 31. As this court observed in *Salt Lake City v. Salt Lake County*, 568 P.2d 738, 741-42 (Utah 1977) (footnote omitted):

> [I]n case of any uncertainty or ambiguity in a statute, a reasonable administrative interpretation and practice should be given some weight. And this is particularly true when such an administrative interpretation and practice has persisted for a long time without any legislative correction or change.

During the past twenty-five years, it is very likely that hundreds of boundary changes have been made in the many taxing entities in this state. Yet no one has questioned the commission's interpretation until this case arose in 1988.

I would affirm the trial court.