SOCIETY OF SEPARATIONISTS, INC., a Maryland nonprofit corporation, Richard Andrews, and J. Walker, Plaintiffs and Appellees,

v.

Ron WHITEHEAD, Tom Godfrey, Nancy Pace, Alan Hardman, Roselyn Kirk, and Don Hale, Salt Lake City Council members, Defendants and Appellants.

No. 920233.

Supreme Court of Utah.

Dec. 10, 1993.

---

Brian M. Barnard, John Pace, Salt Lake City, for plaintiffs.

Roger F. Cutler, Bruce R. Baird, Salt Lake City, for defendants.

Paul D. Lyman, Richfield, for amicus Utah League of Cities & Towns and amicus Richfield City.

Kathryn D. Kendell, Salt Lake City, for amicus American Civ. Liberties Union.

ZIMMERMAN, Justice:

Defendants Ron Whitehead, Tom Godfrey, Nancy Pace, Alan Hardman, Roselyn Kirk, and Don Hale, members of the Salt Lake City Council as of September 1991 (collectively referred to as "City Council" or "Council"), appeal from a district court order denying their motion for summary judgment and granting summary judgment to plaintiffs Richard Andrews, J. Walker, and the Society of Separationists (collectively referred to as "Separationists"). The district court ruled that the City Council had violated the portion of article I, section 4 of the Utah Constitution which provides, "No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or for the support of any ecclesiastical establishment." Specifically, the district court held that the Council had impermissibly expended public money and had used public property to support religious exercise when it permitted prayer to be given during that portion of City Council meetings set aside for opening remarks. The district court permanently enjoined the Council from making further ex-

penditures for such purposes and from allowing prayer before its meetings.

We conclude that the City Council's practice does not offend article I, section 4 of the Utah Constitution. Therefore, we reverse the district court's ruling and direct entry of judgment for the City Council.

The material facts are not in dispute. On January 8, 1980, members of the newly constituted Salt Lake City Council unanimously agreed on a policy of opening each meeting with the Pledge of Allegiance and prayer.[1] In September 1987, an assistant city attorney advised the council by letter that opening ceremonies which included prayer were probably permitted by the United States Constitution as interpreted by the United States Supreme Court in *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). The letter also indicated, however, that in light of a subsequent opinion by the United States Court of Appeals for the Fifth Circuit, any prayers offered should be nondenominational. *See Stein v. Plainwell Community Sch.*, 822 F.2d 1406, 1410 (5th Cir. 1987). In other words, the prayers should not attempt to proselytize or prefer one religion over another.

The city attorney suggested that two procedures be implemented to achieve the goal of nondenominational prayer. First, the invitations should be extended to a variety of community members, including not only ministers and religious officials, but representatives of civic organizations as well. Second, those selected should be advised to offer invocations that were nondenominational and nonproselytizing if at all possible.

As a result of the city attorney's opinion, opening prayers were suspended for several months while the issue was debated. On May 17, 1988, the practice was reinstated, but only pursuant to a policy consistent with the city attorney's opinion. During 1990 and 1991, this policy resulted in opening remarks by civic community leaders and representatives of the Greek Orthodox Church, the Baha'i Faith, the Japanese Church of Christ, the Church of Scientology, and the Eckankar Faith, among others.

In September 1991, the Society of Separationists, a nonprofit Maryland corporation dedicated to preserving and maintaining separation of church and state, requested that the City Council stop the practice of permitting opening prayers. The Council discussed the matter at its September 19th meeting and decided to continue the practice. In a letter dated September 25, 1991, the city attorney advised the Separationists that the opening remarks would continue and include, but would not be limited to, prayer. A draft policy was submitted to the group for review and comment.

On September 26, 1991, the Separationists filed this action in Third District Court, alleging that the City Council had expended public funds for a religious exercise in violation of article I, section 4 of the Utah Constitution. The Separationists sought a permanent injunction to forbid the Council and its members from allowing or having prayers at meetings or from expending any public funds, resources or property in support of such prayers.[2] Subsequently, both parties filed motions for summary judgment.

On March 2, 1992, the district court denied the City Council's motion and granted that of the Separationists. The court concluded that

---

1. Salt Lake City became a municipal corporation on January 19, 1851, pursuant to an ordinance enacted by the General Assembly of the State of Deseret. *See infra* note 12. At that time, it was known as Great Salt Lake City. The executive branch of city government consisted of a mayor elected at large, while legislative power was delegated to a city council made up of members representing various districts. From the outset, the city council opened its meetings with prayer. This practice continued until 1911, when state statute mandated the adoption of a commission form of government. This change resulted in the merger of the executive and legislative functions.

Prayer was not usually offered at the opening of commission meetings.

The commission form continued in Salt Lake City for 69 years until voters adopted a council-mayor form of government. As a result, in January 1980, city government returned to its former system, providing for the separation of the executive and legislative functions.

2. While the lawsuit was pending, the City Council, by a vote of five to two, passed a resolution formalizing the opening ceremony policy. The resolution provides in part:

The Salt Lake City Council has traditionally invited the presentation of thoughts, readings

the Council had violated article I, section 4 of the Utah Constitution, which provides:

> The rights of conscience shall never be infringed. The State shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; no religious test shall be required as a qualification for any office of public trust or for any vote at any election; nor shall any person be incompetent as a witness or juror on account of religious belief or the absence thereof. There shall be no union of Church and State, nor shall any church dominate the State or interfere with its functions. *No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or for the support of any ecclesiastical establishment.* No property qualification shall be required of any person to vote, or hold office, except as provided in this Constitution.

Utah Const. art. I, § 4 (emphasis added).

Using a "plain language" analysis, the district court found that prayer before meetings was a "religious exercise" and that city "money" and "property" were being used to present those exercises. The court stated:

> The inclusion of prayers in City Council meetings results in the expenditure of public funds, assets and resources of Salt Lake City Corporation. City facilities (meeting rooms, etc.), City equipment (microphones, podiums, stages, etc.), City resources (electricity, printing of programs, etc.), and City employees' time (in supervising, attending, etc.), are used and expended in programming, witnessing and/or reciting said prayers. Said funds, assets and resources of Salt Lake City Corporation are utilized to aid in the recitation of said prayers with the knowledge, approval, concurrence and ratification of the defendants.

On the basis of these undisputed facts, the district court declared that the policy violated article I, section 4, and it enjoined the City Council from continuing the practice. The City Council now appeals.

and invocations, along with the Pledge of Allegiance to the Flag, as an Opening Ceremony before certain of its meetings. This opening to the City's legislative process is solely for a secular purpose, among other reasons, to: (1) provide a moment during which Council members and the audience can reflect on the importance of the business before the Council; (2) promote an atmosphere of civility; (3) encourage lofty thought and high-mindedness; (4) recognize cultural diversity; (5) foster sensitivity for and recognize the uniqueness of all segments of our community. The presentations shall be done on a volunteer basis and without cost to the City. The presentations are intended to be non-denominational and non-proselytizing in character; however, the City will not dictate the form or content of any such presentation.

It is the formal policy of the Salt Lake City Council to seek out a wide variety of community organizations, churches and individuals to offer thoughts, readings and invocations at Council meetings to achieve its stated purposes.

The resolution also provided a procedure:

1. Thoughts, readings and invocations, together with a Pledge of Allegiance to the Flag, will be given at the beginning of regular Tuesday Council meetings.

2. Police Chaplain Max Yospe or a successor designated by the Council will coordinate the presentation of thoughts, readings and invocations, as he has done in the past. When the scheduled individual does not attend the meetings, the Council will not make any last minute substitutions and the meeting will begin without any such presentation, except for the Pledge to the Flag.

3. Council staff will mail a letter every six months to a very wide variety of churches and other civic organizations, inviting them to contact Mr. Yospe to be scheduled for presenting a thought, reading or invocation. Enclosed in the mailing will be a copy of the thought/reading/invocation suggestion sheet. Individuals who have not received a written invitation from the Council, but who want to participate are also welcome to present a thought, reading or invocation at a Council meeting by requesting, in writing, an opportunity through Chaplain Yospe or Council staff.

4. Every six months, Council staff will ask the City Recorder to give the City Attorney, Police Chaplain and City Council a listing of the individuals giving thoughts, readings and invocations and their religious or other relevant affiliation, if available.

5. The attached "Suggestions for Presenters" will be given to each person who is designated to give a thought, reading or invocation as a memorilization of the Council's objectives and desires regarding this issue.

6. In order to better inform those attending Council meetings that thoughts and readings, as well as invocations, are welcome at Council meetings, the title on the section of the Council agenda will read "Invocation/Reading/Thought."

We first state the standard of review. When no material facts are in dispute, a challenge to summary judgment presents only conclusions of law for review. *See* Utah R.Civ.P. 56(c); *Schurtz v. BMW of N. Am., Inc.,* 814 P.2d 1108, 1111 (Utah 1991). We give the district court's legal conclusions no deference. *Schurtz,* 814 P.2d at 1112.

■■■ The City Council argues that we should uphold its practice unless the Separationists show that the practice is unconstitutional "beyond a reasonable doubt."[3] We agree with the Council that the burden of showing the unconstitutionality of the practice is on the Separationists. *See State v. Rio Vista Oil, Ltd.,* 786 P.2d 1343, 1349 (Utah 1990). However, we do not agree that the showing must be made "beyond a reasonable doubt" as that phrase has been interpreted in the criminal law context, despite language to that effect in *Salt Lake City v. Savage,* 541 P.2d 1035, 1037 (Utah 1975), *cert. denied,* 425 U.S. 915, 96 S.Ct. 1514, 47 L.Ed.2d 766 (1976). We think that the City Council has read the *Savage* standard out of context and without reference to the cases upon which it was grounded[4] or our decisions since then.[5] We therefore restate the burden to be met by one who challenges an enactment on constitutional grounds: The act is presumed valid, and we resolve any reasonable doubts in favor of constitutionality. *In re Criminal Investigation,* 754 P.2d 633, 640 (Utah 1988); *Snow v. Keddington,* 113 Utah 325, 336, 195 P.2d 234, 240 (1948).

With this standard in mind, we examine the City Council's claim that the district

court's legal conclusion of unconstitutionality was in error. The parties do not agree on the proper approach to be taken in determining the meaning of article I, section 4. The Council argues that the district court erred when it looked only to the article's language, asserting that an examination of the history and textual context of the provision is appropriate and shows that the framers did not intend to prohibit prayer before public meetings.

The Separationists claim that any resort to history is inappropriate and contend that it is entirely proper to examine the constitutional language alone. They focus on the two sentences in article I, section 4 that provide:

There shall be no union of Church and State, nor shall any church dominate the State or interfere with its functions. No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or for the support of any ecclesiastical establishment.

The Separationists make two claims based on this language: (i) that the City Council's policy constitutes a union of church and state; and (ii) that the city's use of public funds and property in effecting the Council's policy violates the prohibition against the use of such for the religious exercise of prayer.

Any decision in this case turns on the proper interpretation to be given article I, section 4. We do not agree with the City Council's apparent contention that the language of the Utah Constitution is not the proper starting place for analysis and can be ignored. Similarly, we disagree with the

3. At the time this action was brought, the City Council's policy had been adopted but had not yet been formalized as an ordinance or resolution. However, it was formalized as a resolution soon after. A resolution may be treated as an ordinance and therefore presumed constitutional if it meets the formal requirements of an ordinance. 1 C. Dallas Sands & Michael E. Labonati, *Local Government Law* § 9.09, at 9–42 (1993); *see* 5 Eugene McQuillan, *Municipal Corporations* § 15.02, at 55–56 (1989); *Salt Lake City v. Savage,* 541 P.2d 1035, 1037 (Utah 1975), *cert. denied,* 425 U.S. 915, 96 S.Ct. 1514, 47 L.Ed.2d 766 (1976). The formal requirements are detailed in section 10–3–718 of the Utah Code, which requires that resolutions contain sections substantially similar to those prescribed for ordinances. Utah Code Ann. § 10–3–718. Although

these statutory requirements were not met by the Council policy in place at the time of the lawsuit, the Separationists have not relied on the distinction. Nor have they challenged the formal resolution passed by the City Council following the initiation of the lawsuit. We do not think the informal status of the policy at the time of this suit is outcome determinative.

4. *See Trade Comm'n v. Skaggs Drug Centers, Inc.,* 21 Utah 2d 431, 436–37, 446 P.2d 958, 962 (1968); *Snow v. Keddington,* 113 Utah 325, 336, 195 P.2d 234, 240 (1948).

5. *E.g., City of Monticello v. Christensen,* 788 P.2d 513, 516 (Utah), *cert. denied,* 498 U.S. 841, 111 S.Ct. 120, 112 L.Ed.2d 89 (1990); *In re Criminal Investigation,* 754 P.2d 633, 640 (Utah 1988).

Separationists and the district court that our analysis should be limited to the literal reading of two sentences of that provision, particularly when, as we note below, such a literal reading produces practical consequences that seem at odds with other provisions in the constitution. *See* discussion *infra.* The remainder of article I, section 4's language, as well as other provisions dealing with the general topic of freedom of religion and conscience, should also be considered, as should the unique history of church-state relations in Utah—relations that occupied center stage in our state's social and political history for the almost fifty years preceding adoption of the 1896 constitution.[6] *See Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 675 (Utah 1985); *American Fork City v. Crosgrove*, 701 P.2d 1069, 1072 (Utah 1985); *Lehi City v. Meiling*, 87 Utah 237, 277–78, 48 P.2d 530, 549 (1935).

Although it may not be the only starting place for an analysis of the language of article I, section 4, we begin with history. As Justice Holmes said, "[A] page of history is worth a volume of logic." *New York Trust Co. v. Eisner*, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921). That statement is particularly true here.

Mormon[7] pioneers first entered the Salt Lake Valley in July 1847. They sought refuge in what was then Mexican territory from religious persecution which they and their newly founded religion had successively encountered in Ohio, Missouri, and Illinois. *See Thomas v. Daughters of Utah Pioneers*, 114 Utah 108, 197 P.2d 477, 510 (1948) (Wolfe, J., dissenting), *cert. denied*, 336 U.S. 930, 69 S.Ct. 739, 93 L.Ed. 1090 (1949). The Mormons were the first substantial group of pioneers to settle in the territory. They constituted an overwhelming majority of the population during the almost fifty years Utah was a territory and remain so today. For that reason, Utah is the "only state in the Union which is known primarily because of the religion of its leading denomination" and is the sole state "that traces its origin to the founding of a new Faith" on American soil. Andrew L. Neff, *History of Utah* 1 (1940) [hereinafter "Neff"]; *see Thomas*, 197 P.2d at 488 (opinion of Pratt, J.).

Upon arrival, necessity, practicality, and the religiously cohesive nature of the settlers led them to look to the Mormon Church hierarchy for leadership in all aspects of their lives.[8] Neff, at 107–08. As a result, an exclusively theocratic system administered

6. We have encouraged parties briefing state constitutional issues to use historical and textual evidence, sister state law, and policy arguments in the form of economic and sociological materials to assist us in arriving at a proper interpretation of the provision in question. *State v. Earl*, 716 P.2d 803, 806 (Utah 1986) (citing *State v. Jewett*, 146 Vt. 221, 500 A.2d 233, 236–37 (1985)); *see City of Monticello*, 788 P.2d at 516–19; *Rampton v. Barlow*, 23 Utah 2d 383, 385–86, 464 P.2d 378, 379–82 (1970); *General Elec. Co. v. Thrifty Sales, Inc.*, 5 Utah 2d 326, 334, 301 P.2d 741, 746 (1956); *University of Utah v. Board of Examiners*, 4 Utah 2d 408, 425–26, 295 P.2d 348, 360 (1956). Each of these types of evidence can help in divining the intent and purpose of the framers, a critical aspect of any constitutional interpretation. *Condemarin v. University Hosp.*, 775 P.2d 348, 367–68 (Utah 1989) (Zimmerman, J., concurring); *P.I.E. Employees Fed. Credit Union v. Bass*, 759 P.2d 1144, 1146 (Utah 1988); *Rampton*, 23 Utah 2d at 385–86, 464 P.2d at 379; *State v. Betensen*, 14 Utah 2d 121, 123, 378 P.2d 669, 669 (1963); *Gammon v. Federated Milk Producers Ass'n*, 12 Utah 2d 189, 190, 364 P.2d 417, 418 (1961); *General Electric*, 5 Utah 2d at 334, 301 P.2d at 746; *University of Utah*, 4 Utah 2d at 426, 295 P.2d at 361; *State ex rel. Salt Lake City v. Eldredge*, 27 Utah 477, 482, 76 P. 337, 339

(1904); *People ex rel. O'Meara v. City Council*, 23 Utah 13, 17–18, 64 P. 460, 462 (1900); *see State v. Earl*, 716 P.2d at 806; *KUTV, Inc. v. Conder*, 668 P.2d 513, 518–19 (Utah 1983); *Allen v. Rampton*, 23 Utah 2d 336, 338–39, 463 P.2d 7, 8 (1969); *Thomas v. Daughters of Utah Pioneers*, 114 Utah 108, 127–29, 197 P.2d 477, 487–88 (1948), *cert. denied*, 336 U.S. 930, 69 S.Ct. 739, 93 L.Ed. 1090 (1949); *Cooper v. Utah Light & Ry. Co.*, 35 Utah 570, 582–84, 102 P. 202, 207 (1909); *cf. City of Monticello*, 788 P.2d at 516–19.

7. The proper title of the Mormon Church is "The Church of Jesus Christ of Latter-day Saints." In this opinion, we will use the common terms of "Mormon Church" and "Mormons."

8. Establishing this government was not difficult. The Mormons had lived under a de jure government in Nauvoo, Illinois, after Joseph Smith, the founder and then leader of the Mormon Church, obtained a home rule charter from the Illinois Legislature. Clifford L. Ashton, *The Federal Judiciary in Utah* x (1988) [hereinafter "Ashton"]. Nauvoo soon became larger than Chicago, causing conflict with non-Mormons in the area. *Id.* This conflict eventually led to Joseph Smith's assassination. *Id.*

civic matters from 1847 to 1849.[9] *Id.* at 108–11. Church leaders, however, wished to establish a civil government, and a constitution was adopted and ratified by the citizens of the region on March 12, 1849.[10] *Id.* at 114–16. This first constitution contained features of the Illinois Constitution of 1818, as well as provisions similar to those of the federal constitution which divided the government into legislative, executive, and judicial branches. *Id.* at 116.

From the outset, Mormon leaders sought statehood for their new home, referred to as the "State of Deseret," and the self-government that such a status would bring. Clifford L. Ashton, *The Federal Judiciary in Utah* xii (1988) [hereinafter "Ashton"]; *see* Brad C. Smith, Comment, *Be No More Children: An Analysis of Article I, Section 4 of the Utah Constitution,* 1992 Utah L.Rev. 1431, 1441–42 [hereinafter "Smith"]. Deseret, as proposed in the statehood petition, encompassed nearly all of Utah and Nevada, most of Arizona and Colorado, portions of New Mexico, Wyoming, and Idaho, a small part of Oregon, and Southern California.

Neff, at 117. This vast acreage had become part of the United States on February 2, 1848, when the Treaty of Guadalupe–Hidalgo was signed. *Id.* at 113. When the Deseret Legislature met for the first time on July 2, 1849, it petitioned Congress for statehood. Smith, at 1443. That petition, however, foundered over the national issue of slavery when Congress designated Utah as a "slave" territory in the Compromise of 1850.[11] John J. Flynn, *Federalism and Viable State Government—The History of Utah's Constitution,* 1966 Utah L.Rev. 311, 316 [hereinafter "Flynn"]; Smith, at 1444.

Utah's designation as a territory meant that those holding the most important government positions could not be chosen in local elections, but would be appointed by federal officials in Washington, D.C.[12] The first group of territorial leaders consisted of Mormons and non-Mormons, Utah residents and nonresidents, the most prominent territorial official being Governor Brigham Young, who was also president of the Mormon Church.[13] Neff, at 169. However, this

9. From July 24, 1847, until December of that same year, the Council of the Twelve Apostles of the Mormon Church governed the Mormon settlement. Andrew L. Neff, *History of Utah* 110–11 (1940) [hereinafter "Neff"]. In December 1847, the Mormon pioneers voted to give complete jurisdiction of municipal matters to the High Council of the Stake of Zion, a governing body that church authorities had created two months earlier. *Id.* In January 1849, church authorities relieved the High Council of its civic responsibilities, entrusting "magistrate" or "mayoral" duties to bishops of the various "wards," or church subdivisions. *Id.* at 111. In what was then Great Salt Lake City, now known as Salt Lake City, the Legislative Council, another name for the Mormon Church Council, passed civil laws for the municipality. *Id.* at 124.

10. A constitutional convention was organized on March 5, 1849. Neff, at 114–15. A drafting committee was charged with developing a document that would organize and govern the area "until the Congress of the United States should otherwise provide by law." *Id.* The five-man committee, consisting of prominent church leaders, presented its proposal to the convention on March 8, 1849. *Id.* at 115. Two days later, the convention unanimously adopted the Constitution of the State of Deseret. *Id.* at 115–16; Brad C. Smith, Comment, *Be No More Children: An Analysis of Article I, Section 4 of the Utah Constitution,* 1992 Utah L.Rev. 1431, 1442 [hereinafter "Smith"].

11. The Compromise of 1850 created the "free state" of California and established Utah and New Mexico as "slave" territories. Smith, at 1444.

Although the Territory of Utah, as designated by Congress, was smaller than the State of Deseret, it was larger than Texas, being bordered by the 37th and 42nd parallels to the north and south, the Rocky Mountains to the east, and the Sierra Nevadas to the west. Neff, at 168.

12. Although the Territory of Utah was created on September 9, 1850, the government of the State of Deseret continued to operate until the late summer of 1851, when the territorial government actually began to function. Neff, at 122. During the interim, the General Assembly of the State of Deseret gave a charter to and incorporated Great Salt Lake City. *Id.* at 126.

13. Deseret residents Seth M. Blair and Joseph L. Heywood were appointed, respectively, United States Attorney and United States Marshal. Neff, at 168. Four nonresidents were also appointed, including B.D. Harris of Vermont as Secretary of the territory, Lemuel G. Brandebury of Pennsylvania as Chief Justice, Perry E. Brocchus of Alabama as Associate Justice, and Zerubbabel Snow of Ohio as Associate Justice. *Id.;* Ashton, at 1. With the exception of Justice Snow, the nonresidents were also non-Mormons. Neff, at 173; Ashton, at 1.

combination proved to be rather inharmonious, especially following the public announcement in 1852 of the Mormon practice of polygamy [14]—a practice that met with intense legal and political opposition outside the territory. Martin B. Hickman, Utah Constitutional Law 44 (1954) (unpublished Ph.D. dissertation, University of Utah) [hereinafter "Hickman"].

In its 1856 platform, the newly created Republican Party denounced polygamy and slavery as the "twin relics of barbarism," insisting that it was Congress's right and duty to outlaw both practices in the territories. Eugene E. Campbell, *Governmental Beginnings, in* Utah's History 153, 165 (Richard D. Poll et al. eds., 1978) [hereinafter "Campbell"]. Seeking to deprive the Republicans of their anti-Mormon monopoly as well as to divert attention from the slavery issue, the once supportive Democratic party also adopted a policy of hostility toward the Mormons.

Despite growing national opposition to polygamy, residents of the territory once again sought statehood. A constitutional convention was held in March 1856, and delegates adopted a document closely paralleling the Deseret Constitution of 1849. Hickman, at 45; Smith, at 1446. However, with the anti-Mormon Republican party winning control of the United States House of Representatives for the first time, delegates from the Utah territory decided against petitioning for statehood at that time. Hickman, at 45; Neff, at 457–59; Campbell, at 165.

Other developments added to the strain between Mormons and non-Mormons, as well as between Utah and the federal government. As one historian characterized it:

Letters and verbal reports from three Indian agents, Utah surveyor general David H. Burr, former U.S. mail contractor W.F.M. McGraw, and territorial supreme court justices George P. Stiles and William W. Drummond alleged that the Mormons in Utah were unwilling to accept and cooperate with non-Mormon officials; that they were alienating the Indians from the federal government; that they had destroyed the supreme court records and had so dominated the lower courts that there was *no justice for non-Mormons; that Brigham Young and other leaders were disrespectful of federal officials, both living and dead; that the priesthood government was violent and despotic; and that a state of rebellion existed.

Campbell, at 165–66; *see* Ashton, at 11.

Reports such as these led President James Buchanan, *Democratic victor in the 1856* election, to replace Brigham Young as Governor of the Territory of Utah. Campbell, at 165. Believing that the Mormons were in a state of rebellion, Buchanan was convinced that a new governor would not be accepted without force. *Id.* Consequently, in 1857, when Alfred Cumming of Georgia was appointed as the new territorial governor, the President ordered a military force of 2500 troops to accompany him to Great Salt Lake City. *Id.* at 166. Brigham Young responded. On September 15, 1857, Young declared martial law and proclaimed that any invasion of Utah would be forcefully resisted. *Id.* at 168; Ashton, at 13.

While the approaching Army wintered at nearby Fort Bridger, Wyoming, negotiations began in an effort to prevent an armed confrontation. Campbell, at 167–69. Some hostilities did occur, however, with Mormons burning army supplies and interfering with military communications. *Id.* at 168. On April 12, 1858, Governor Cumming, accompanied only by Mormon troops, arrived in Great Salt Lake City to negotiate.[15] *Id.* at

---

14. Polygamy is defined by Webster's Dictionary as a "marriage in which a spouse of either sex may have more than one mate at the same time." *Webster's New International Dictionary* 1912 (2d ed. 1954). The Mormon practice known as polygamy, however, was limited to men taking several wives. That practice is technically defined as polygyny. *Id.* at 1913.

15. Although negotiations with Governor Cumming had been promising, Mormon leaders were distrustful of the Army. Eugene E. Campbell, *Governmental Beginnings, in* Utah's History 153, 169 (Richard D. Poll et al. eds., 1978) [hereinafter "Campbell"]. On March 21, 1858, Brigham Young ordered the abandonment of all northern settlements, including Great Salt Lake City. *Id.;* Neff, at 497; Ashton, at 14. Residents did not return to their homes until several days after Colonel Albert Sidney Johnston's army moved through Great Salt Lake City on June 26, 1858,

169. Having been received as governor and well-treated by Mormon leaders, Cumming promised that any entry into the territory by the United States Army would be peaceful and that any camps established would be located away from population centers. *Id.;* Neff, at 502–03.

A peace commission appointed by President Buchanan arrived in Utah on June 7, 1858, and despite a threatening movement of federal troops soon after, the parties reached a settlement ending the hostilities on June 12. Campbell, at 169–70; Neff, at 507, 510–11. While this incident served as a reminder of federal sovereignty, the Mormon Church still dominated every aspect of life—political, social, and economic—in the Utah territory. Gustive O. Larson, *Government, Politics, and Conflict, in* Utah's History 243, 243 (Richard D. Poll et al. eds., 1978) [hereinafter "Larson"]. And polygamy continued to be practiced. *Id.*

With the start of the Civil War, the federal government's attention was temporarily diverted from the problem of polygamy. This distraction, combined with Mormon loyalty to the North, led those seeking statehood to believe that such a status could be attained during the war. Hickman, at 46. Another constitution, similar to those of 1849 and 1856, was drafted and submitted to Congress on June 9, 1862. *Id.* at 47; Flynn, at 316. The Utah territory's petition, however, was buried in the House Committee on Territories. Hickman, at 46.

The Civil War did not distract the opponents of polygamy for long. Despite the belief by many in the country that matters of religious practice were not subject to legislative authority, Congress moved to attack polygamy and the Mormon Church. Neff, at 866. On July 1, 1862, the Morrill Antibigamy Act[16] was passed. Hickman, at 46; Neff, at 677; Flynn, at 317. "The new legislation struck at both polygamy and church power by prohibiting plural marriage in the territories, disincorporating the Mormon Church, and restricting the church's ownership of property to $50,000."[17] Larson, at 244. The law, however, was not enforced in the Utah territory because Mormons controlled the judicial system. *Id.* at 244, 249; Neff, at 868. Probate courts functioning as local tribunals had jurisdiction over most criminal offenses, and federal indictments for polygamy could not be obtained from grand juries composed of Mormons. Larson, at 249; Neff, at 190. Thus, despite Congress's efforts, the Mormon Church still exercised considerable control in the territory.[18] Larson, at 246.

In 1867, a special election was held at which the territorial legislature submitted an amended version of the constitution of 1862 to the people for ratification. Hickman, at 47. Upon ratification, Utah's territorial delegate then introduced a bill in Congress to provide for statehood. *Id.* at 48. This bill, like other statehood attempts, died in the Committee on Territories. *Id.* In 1872, a new approach was taken. Instead of submitting a version of the Deseret Constitution of 1849, which was said to be tainted with defeat, the Utah delegation submitted a constitution modelled after that of the state of Nevada, which had been recently admitted. Flynn, at 317; Smith, at 1447–48. Although

en route to establish camp in Cedar Valley. Campbell, at 170; *see* Neff, at 511; Ashton, at 14. This military post, known as Camp Floyd, was abandoned at the start of the Civil War. Neff, at 516.

16. Ch. 126, 12 Stat. 501 (1862).

17. Following the end of the Civil War, three other anti-Mormon bills were introduced in Congress. Neff, at 868. Two of these bills were believed to have been drafted by non-Mormons in Salt Lake City. *Id.* All three essentially sought to destroy local control of government within the Utah territory. *Id.* at 868–69. None, however, became law. *Id.* at 868. Lobbying by the financial backers of the transcontinental railroad, who did not want dissension along the route interfering with the growth of trade and commerce, is credited with helping defeat the anti-Mormon legislation. *Id.* at 874; Gustive O. Larson, *Government, Politics, and Conflict, in* Utah's History 243, 251 (Richard D. Poll et al. eds., 1978) [hereinafter "Larson"].

18. At the constitutional convention of 1862, which had been vetoed by the territorial governor, members of the convention elected officials for the State of Deseret. Larson, at 244; Neff, at 674. Brigham Young was elected governor. Larson, at 244. This "ghost government," operating behind the territorial government, functioned from 1862 to 1870, at which time it faded out of existence. *Id.* at 244–45.

the Utah memorial accompanying the constitution touted the new document's provisions as improvements, the only improvement that interested Congress appeared to be the abolition of polygamy. Once again, admission to the Union was denied. Hickman, at 52; Flynn, at 318.

Opposition to the Mormon Church was also growing within the territory. Non–Mormons, who now made up ten to fifteen percent of the population, sought to break down the Church's · domination of governmental, educational, and economic affairs. Larson, at 247. Economics, in particular, became a crucial issue following the organization of Zion's Cooperative Mercantile Institution ("ZCMI"). *See* O.N. Malmquist, *The First 100 Years: A History of the Salt Lake Tribune 1871–1971* 9 (1971) [hereinafter "Malmquist"]. ZCMI was designed to be "the sole merchandising facility for members of the Mormon Church wherever their number was large enough to justify a branch." *Id.* at 15. Mormon merchants could either join ZCMI or leave the territory and the Mormon Church. *Id.* at 14. As Brigham Young said regarding those Mormons who did not join the cooperative, "[W]e shall leave them out in the cold, the same as the gentiles [non-Mormons], and their goods shall rot upon their shelves." *Id.* To the non-Mormon merchants, the cooperative was a threat to their very existence. *Id.* As feared, ZCMI was a success from the outset with its opening followed by a sharp decline in the sales for non-Mormon and noncooperating Mormon merchants. *Id.* at 16.

In response, non-Mormons and excommunicated Mormons known as the "Godbeites" [19] formed a temporary alliance resulting in the establishment of the Liberal Party in 1870. Larson, at 248. The Mormons then organized their own political group, known as the People's Party. Both political groups used the media to assert their viewpoints. *Id.* The *Mormon Tribune,* later called *The Salt Lake Tribune,* was established by the Godbeites and became the voice of the Liberals, while the *Deseret News,* owned by the Mormon Church, represented the views of the People's Party. *Id.;* Malmquist, at 6, 21. Interestingly, during this time, business rebounded for non-Mormon merchants such that they found their stores "so crowded during church conferences that it was difficult for them to serve their patrons." Malmquist, at 17.

The vitriolic and slanderous nature of the public debate between Mormons and non-Mormons is difficult to exaggerate.[20] With

19. The Godbeites were mostly businessmen who had been excommunicated from the Mormon Church for opposing some of Brigham Young's economic policies. Larson, at 248; Neff, at 878. Their "New Movement" sought "abandonment of Mormon exclusiveness in economic affairs and urged development of the territory's rich mineral resources, two goals also sought by the gentiles [non-Mormons]." Larson, at 248.

20. An example of *The Tribune* 's antagonism toward the Mormon Church can be found in an editorial appearing on August 30, 1877, the day after the death of Church President Brigham Young.

> [Brigham Young] was illiterate and has made a frequent boast that he never saw the inside of a school house. His habit of mind was singularly illogical and his public addresses are the greatest farrago of nonsense that ever was put in print. He prided himself on being a great financier, and yet all his commercial speculations have been conspicuous failures. He was a blarophant, and pretended to be in daily intercourse with the Almighty, and yet he was groveling in his ideas, and the system of religion he formulated was well nigh Satanic. Yet

with this grossness, the illiteracy, this entire ignorance of the art of government, he has succeeded, during an entire generation, in holding absolute sway over a hundred thousand followers, in directing their confidence and affections as to stand to them a very Deity. His death is regarded as the fall of a great man in Israel, and thousands mourn his loss as a personal bereavement.

Yet we believe that the most graceful act of his life has been his death.

*The Salt Lake Tribune,* Aug. 30, 1877, *quoted in* Malmquist, at 45–46.

The *Deseret News* was also known to express its viewpoints with equal exuberance. On March 31, 1880, the following comments appeared:

> There are certain would-be witty persons who think they are uttering a good joke at the expense of the Mormons by repeatedly quoting the words of the late Brigham Young—"We can produce the greatest and smoothest liars or any other shade of character you can mention." The fun of it is they are quoting against themselves. They and their tribe—the manufacturers of anti-Mormon sensations; the scavengers of the press; the slanderers of the living and defamers of the dead; the garblers

the goal of breaking "Brigham Young's economic and political grip on his people," the Liberal Party looked "to continue and intensify the campaign to arouse the federal government to action." *Id.* at 21. Not surprisingly, polygamy became the ground over which the struggle for political control was fought, with the Liberal Party using *The Salt Lake Tribune* as the vehicle for attacking both the practice and the Mormon Church. Larson, at 249; Malmquist, at 20. This strategy had some success on the national level. The practice of polygamy, combined with the perceived danger of a Mormon theocracy, continued to prevent the Utah territory from attaining statehood. Flynn, at 318.

In the midst of this increasingly bitter confrontation, Mormons looked to the United States Supreme Court to support the free exercise of their faith. In *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878), however, the Court upheld the constitutionality of the Morrill Antibigamy Act of 1862. With antipolygamy laws now deemed constitutional, in 1882, Congress passed the Edmunds Act,[21] which amounted to a series of amendments to the Morrill Antibigamy Act. *See* Hickman, at 56; Flynn, at 318–19 n. 56. Targeting the control the Mormons held over institutions of public power, such as probate courts and grand juries—control of which had made the Morrill Act ineffectual—the Edmunds Act disenfranchised polygamists, declared them ineligible for public office, and forbade their service on juries. Gustive O. Larson, *The Crusade and the Manifesto, in Utah's History* 257, 259 (Richard D. Poll et al. eds., 1978) [hereinafter "Larson II"]. As a result of this new legislation, the antipolygamy campaign gained energy in the Utah territory.

Despite this renewed antagonism toward the Mormon Church, yet another constitutional convention met in Salt Lake City in April 1882. Flynn, at 319. The resulting constitution, substantially similar to that of 1872, was introduced in the House of Representatives on June 23, 1882. *Id.;* Hickman, at 57. From the Mormon viewpoint, statehood would be a means of avoiding the enforcement of antipolygamy legislation which did not apply in the states, only in the territories. Smith, at 1449–50. Furthermore, admission as a state would free the Mormons from judicial interpretations of the First Amendment, which had yet to be applied to the states through the Fourteenth Amendment. *Id.* at 1450 n. 87. Like its predecessors, however, this latest bid for statehood also died in the Committee on Territories. Flynn, at 319.

As a result of the Edmunds Act, many Mormons were not permitted to vote or serve on juries, and polygamists faced criminal indictments in the federal courts. Again, the Mormons looked to the United States Supreme Court for help. The Court, however, upheld the disenfranchisement of polygamists, *Murphy v. Ramsey*, 114 U.S. 15, 44–47, 5 S.Ct. 747, 763–65, 29 L.Ed. 47 (1884), as well as criminal convictions for polygamy and cohabitation, *Cannon v. United States*, 116 U.S. 55, 78–79, 6 S.Ct. 278, 290–91, 29 L.Ed. 561 (1884); *Clawson v. United States*, 114 U.S. 477, 487–88, 5 S.Ct. 949, 954, 29 L.Ed. 179 (1884). *See* Larson II, at 261–63.

The final, devastating blow to the Mormon Church and the practice of polygamy was struck on March 3, 1887, when Congress passed the Edmunds–Tucker Act.[22] Flynn, at 319. This legislation was designed to eradicate polygamy by attacking its source—

of public speeches; the blasphemers of sacred things; the cowardly libellers of women and children; the dirty-minded scandal mongers; the craven dastards who fling their filth at those they know will not retaliate; the pen-stabbers; the character assassins; the authors of false telegraphic dispatches; and their aiders and abetters—are the characters referred to. We have had such things among us from the beginning of Utah's settlement. They have multiplied upon us as opportunities have increased for the paying exercises of their per-

verted faculties. Produce them? Yes we could point them out at any time. But no respectable Mormon recognizes their presence or would be seen in their society, and they are permitted to lie on, and fill the cup of their iniquity, unnoticed.
*Deseret News,* March 31, 1880, *quoted in* Malmquist, at 42–43.

**21.** Ch. 47, 22 Stat. 30 (1882).

**22.** Ch. 397, 24 Stat. 635 (1887).

the Mormon Church. *See id.* The statute provided, inter alia,

> for the annulment of the charter of incorporation of the Church of Jesus Christ of Latter-day Saints and for the appointment of trustees to care for the property of the Church. All property not exclusively devoted to the worship of God was to be sold and the proceeds used for the support of the common schools in the territory.

Hickman, at 59.

Three months after the passage of the Edmunds–Tucker Act, a new call was made for statehood. The People's Party called upon Democrats, Republicans, and Liberals to nominate delegates for a convention to be held in Salt Lake City on June 30, 1887. Flynn, at 319; Hickman, at 60; Smith, at 1461. The Republicans refused to support statehood until the Mormon Church renounced its civil power, while the Liberals saw the move as a Mormon trick to gain control of the local government, something that could not be done while Utah remained a territory. Hickman, at 60. The Democrats refused the offer, claiming there was insufficient time to prepare for a convention. *Id.* Nonetheless, a constitution was adopted on July 7, 1887, by delegates representing only the People's Party. *Id.* at 61; Flynn, at 319–20.

With this constitution, the Mormons made a critical concession to Congress on the issue of polygamy. For the first time, polygamy was prohibited and criminalized. Hickman, at 62. The 1887 constitution also provided that any amendment to the polygamy ban would have to be approved by the President and Congress of the United States. *Id.* While Mormon Church leaders publicly stated that this constitution did not violate God's laws, the Church itself still had not banned the practice of polygamy. Larson II, at 269. It was apparent that the constitution of 1887 was a compromise: the Mormon Church was willing to surrender the practice of polygamy while maintaining it as a religious doctrine. Hickman, at 63.

The effort was not good enough. In early 1888, when the Senate Committee on Territories reviewed the 1887 constitution and accompanying memorial, the Committee submitted a resolution to the Senate, stating in part:

> [I]t is the sense of the Senate that the Territory of Utah ought not to be admitted into the Union as a State until it is certain beyond doubt that the practice of plural marriages, bigamy, or polygamy, has been entirely abandoned by the inhabitants of said Territory and until it is likewise certain that the civil affairs of the Territory are not controlled by the priesthood of the Mormon Church.

19 Cong.Rec. 433, 2391 (1888).

Further pressure was brought to bear on the Church in 1890 when two United States Supreme Court decisions upheld anti-Mormon legislation,[23] and the Senate considered a bill that would disenfranchise *all* Mormons. Flynn, at 321; Hickman, at 65–66. The Mormon Church had failed in its efforts to win statehood without renouncing polygamy or abandoning a substantial degree of overt control over the instruments of political power. Hickman, at 67. More importantly, the Church's policies now threatened its very existence.

On September 24, 1890, Mormon Church President Wilford Woodruff announced the official end of polygamy in what is known as the "Manifesto." *Official Declaration–1, in* Doctrine and Covenants 291–92 (1987 ed.) (Mormon scripture). While some doubted the sincerity of this proclamation, in 1891 the Church took the opportunity to show its good faith by disbanding the People's Party and encouraging its members to divide themselves between the Republican and Democratic Parties. Hickman, at 68–69. In 1892, the Mormon-dominated territorial legislature further attested to the Church's sincerity by criminalizing polygamy and similar offenses

---

**23.** *Davis v. Beason,* 133 U.S. 333, 348, 10 S.Ct. 299, 302, 33 L.Ed. 637 (1890) (upholding Idaho Territorial Legislature's disenfranchisement of teachers or advocates of polygamy, including any member of an organization teaching such principles); *Late Corp. of the Church of Jesus Christ of Latter-day Saints v. United States,* 136 U.S. 1, 66, 10 S.Ct. 792, 811, 34 L.Ed. 478 (1890) (upholding confiscation of Church property under Edmunds–Tucker Act).

such as cohabitation.[24]  Flynn, at 322; Hickman, at 68.  Statehood now appeared inevitable.[25]

On July 16, 1894, President Grover Cleveland signed the Utah Enabling Act,[26] which authorized the election of delegates for a constitutional convention.[27]  Flynn, at 323; Smith, at 1453.  One section of the Act required Utah's constitution to include various provisions, collectively known as the "ordinance," which were irrevocable without the consent of the United States and the people of Utah.[28]  Flynn, at 323; Gustive O. Larson & Richard D. Poll, *The Forty-fifth State, in Utah's History* 387, 394 (Richard D. Poll et al. eds., 1978) [hereinafter "Larson & Poll"].  The ordinance included the following:

> That perfect toleration of religious sentiment shall be secured, and that no inhabitant of said State shall ever be molested in person or property on account of his or her mode of religious worship; Provided, That

polygamous or plural marriages are forever prohibited.

> . . . .

> The Legislature shall make laws for the establishment and maintenance of a system of public schools, which shall be open to all the children of the State and be free from sectarian control.

Ch. 138, 28 Stat. 107 (1894); 1A Utah Code Ann. § 3, at 44 (1991).

The constitutional convention convened on March 4, 1895, in Salt Lake City.  1 *Official Report of the Proceedings and Debates of the Convention* 3 (Salt Lake City, Star Printing Co. 1898) [hereinafter "*Proceedings*"].[29]  Of the 107 delegates, only 28 were non-Mormons.[30]  Hickman, at 71; Larson & Poll, at 393; Malmquist, at 158.  The delegates drew much of the final document from previous Utah constitutions and the constitutions of other states—Nevada, Washington, Illinois, and New York in particular.[31]  Flynn, at 323;

---

**24.** Following the Manifesto and the disbandment of the People's Party, Mormon Church leaders submitted a petition for amnesty to President Harrison, who did not act on the matter until after his unsuccessful bid for reelection.  Gustive O. Larson & Richard D. Poll, *The Forty-fifth State, in Utah's History* 387, 391 (Richard D. Poll et al. eds., 1978) [hereinafter "Larson & Poll"].  On January 4, 1893, he granted amnesty and pardon to those polygamists who abstained from the practice after November 1, 1890.  *Id.*

**25.** In 1893, a bill was introduced in Congress which provided for Utah's admission to the Union.  H.R. 352, 53d Cong., 1st Sess. (1893); *see* Smith, at 1453; Hickman, at 69.  With the passage of the bill in both houses, the renunciation of polygamy by the Mormon Church had been accepted by Congress.  Flynn, at 323.  A second bill, providing for the restoration of Mormon Church property seized under the Edmunds–Tucker Act, was introduced in Congress at the same time.  Larson & Poll, at 392.  Because of this bill, in January 1894, personal securities of $400,000 were returned to the Mormon Church. *Id.*  Real property, however, was not returned until statehood was granted.  *Id.*

**26.** Ch. 138, 28 Stat. 107 (1894); 1A Utah Code Ann. 43–52 (1991).

**27.** The Act allowed previously disenfranchised Mormons to participate in the election of delegates to the constitutional convention.  Hickman, at 70.

**28.** The ordinance was incorporated as article III of the Utah Constitution.  However, some have

questioned the constitutionality of the requirement that the United States government agree to any revocation of the ordinance.  *See* Flynn, at 323 n. 89.  "In particular, delegation of part of the amending process of a state constitution to the federal government raises the question of whether the state has been admitted into the Union on an equal footing with sister states." *Id.* (citing *Coyle v. Smith*, 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853 (1911)).

**29.** The official proceedings of the convention were recorded in two volumes entitled *Official Report of the Proceedings and Debates of the Convention* (Salt Lake City, Star Printing Co. 1898) [hereinafter "*Proceedings*"].  Unfortunately, the official proceedings lack reports from the various subcommittees that did much of the drafting of the document.  As a consequence, specific legislative history is often lacking for significant provisions of the ultimate document.

**30.** The non-Mormons apparently made up for their small number by making 46% of the speeches recorded.  Malmquist, at 158 (citing Stanley S. Ivins, *A Constitution for Utah*, 25 Utah Hist.Q. 114 (1957)).

**31.** The Nevada Constitution had been the model for the Utah Constitution of 1872.  At the time of the convention, Illinois and New York had recently revised their constitutions, although both have been substantially modified since 1895.  Smith, at 1454 n. 114.  The Washington Constitution had been adopted in 1890.  *Id.* at 1454.

Hickman, in his dissertation on Utah constitutional law, articulated a reason worth noting for the framers' reliance on other state constitutions:

Hickman, at 72; Smith, at 1454. With this foundation, most debates centered on local problems such as "woman suffrage, apportionment of the state legislature, the salaries of state officials, the location of the state university, and the restrictions on aid to business by the legislature." Flynn, at 323; *see* Hickman, at 71–72, 76. There was little discussion or controversy regarding any of the provisions of the Declaration of Rights. *See* 1 *Proceedings passim.* The final version of the Utah Constitution was adopted without dissent on May 8, 1895.[32]

It is relevant to note here that article I, section 4 was among the provisions of the Utah Declaration of Rights that aroused little controversy among either Mormon or non-Mormon delegates. Indeed, only two minor and inconsequential changes were made to the original draft of article I, section 4. That original version read as follows:

> The rights of conscience shall never be infringed. *Perfect toleration of religious sentiment is guaranteed.* The state shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; no religious test *or property qual-*

[T]he settlers of the territory did not live in a political vacuum; nor did those who followed them as pioneers, or those who were born as natives of the territory. The first constitution of Deseret was not an unusual document. It bore a great resemblance to the Illinois constitution of 1818, and it served unchanged as a model for the constitutions of 1856, 1862, and 1867. It is remarkable that although the social development of the Mormons varied from the usual cultural pattern, their political development tended to parallel that of the rest of the nation. In 1872 the constitutional convention borrowed the constitution of Nevada as the basis for its proposed constitution. This introduced into Utah constitutions the changes in constitutional development that were taking place in the nation. The constitution of 1872 was the model of the constitutions of 1882 and 1887. The development of Utah constitutional thought thus shows familiarity with constitutional development in other states, and demonstrates that Utah, despite her experiments in marriage and economic relationships, was not ready to depart from the traditional forms of American government. This can be traced directly to Joseph Smith's attitude toward American government. He taught that the American Constitution was written by wise men chosen of God for that purpose, and that its weaknesses lay not in its structure but in the men who operated the machinery of government. . . .

*ification* shall be required for an office of public trust, or for any vote at any election; nor shall any person be incompetent as a witness or juror on account of religious belief or the absence thereof. There shall be no union of church and state, nor shall any church dominate the state, or interfere with its functions. No public money or property shall be appropriated for or applied to any worship, exercise, or instruction, or for the support of any ecclesiastical establishment.

1 *Proceedings,* at 230 (emphasis added). The convention modified this draft by moving the perfect-toleration-of-religious-sentiment phrase, which was part of the required ordinance, to article III and by modifying and moving the property qualification language to the end of the provision. *See id.* at 231–33, 806–07. The final result was the same version of article I, section 4 that we address today.

With this prologue, we now turn to the central issue before us: whether the district court correctly concluded that the City Council's policy violated article I, section 4 of the Utah Constitution.[33]

> When, therefore, it became the task of the people of Utah to write a constitution they constructed a document that reflected the patterns of state constitutionalism.

Hickman, at 73–74.

32. The final vote on adoption was 99 "ayes" and 8 "absents." 2 *Proceedings,* at 1850–51. The document was ratified by the voters on November 5, 1895, and submitted to President Cleveland on December 16, 1895. Hickman, at 77. The President proclaimed Utah a state on January 4, 1896. *Id.*

33. Article I, section 4 provides:

> The rights of conscience shall never be infringed. The state shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; no religious test shall be required as a qualification for any office of public trust or for any vote at any election; nor shall any person be incompetent as a witness or juror on account of religious belief or the absence thereof. There shall be no union of Church and State, nor shall any church dominate the State, or interfere with its functions. No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or for the support of any ecclesiastical establishment. No property qualification shall be required of any person to

The district court found that the Council's policy of permitting, indeed soliciting, persons to give prayers as part of its public meetings violated the language of article I, section 4 that provides, "No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or for the support of any ecclesiastical establishment." Utah Const. art. I, § 4. The Separationists argue that the district court's conclusion was correct, but they also encourage us to consider alternative grounds for striking down the City Council's policy. Specifically, the Separationists claim that the policy also violates those portions of article I, section 4 forbidding any "union of Church and State" and "any Church dominat[ing] or interfer[ing] with [state] functions." Utah Const. art. I, § 4.

We will address the Separationists' alternative grounds in turn but first focus on the rationale relied on by the district court. To uphold that court's "no public money or property" ruling, we must reach two conclusions: (i) Prayer given before council meetings as part of a program of opening remarks constitutes "religious worship, exercise or instruction"; and (ii) the use of public resources in support of the presentation of opening remarks that include prayer constitutes an "appropriat[ion]" or "applicat[ion]" of "public money or property" to the forbidden ends.

■ We first address whether prayer is "religious worship, exercise or instruction." The City Council asserts that whatever the common understanding of the words "religious worship" or "exercise," the framers of the Utah Constitution did not intend prayer before legislative bodies to constitute "religious exercise" within the meaning of article I, section 4 because the framers themselves arranged for opening prayers during the constitutional convention. Relying on the United States Supreme Court's decision in *Marsh*

*v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), which upheld under the United States Constitution, largely on historical grounds, the State of Nebraska's practice of having prayer before legislative sessions, the City Council asks that we find a similar exception to shield its practice from the apparently plain language of article I, section 4.[34]

While we agree that the *Marsh* decision might control here if the Council's practice were being challenged as a violation of the federal constitution, it does not control our analysis under the Utah Constitution, with its broader and more detailed prohibitions. Furthermore, we think the situation presented in *Marsh* is arguably distinguishable from the case before us, as are the carefully ecumenical prayer practices of those attending the 1895 constitutional convention. First, *Marsh* involved prayer before a state legislature whose floor sessions do not involve participation by the public to the degree found in city council meetings. The constitutional convention proceedings similarly had limited public participation. Second, the practice at issue in *Marsh* was part of a longstanding and unbroken tradition. Here, Salt Lake City did not have prayer at council meetings from 1911 to 1979, the period of time during which the executive and legislative branches merged into a commission form of government.[35] Consequently, we find our history less persuasive on this topic and decline to rely on the analogy to the facts of *Marsh* or to the practices of the 1895 convention participants.

The City Council also argues that Utah case law supports the assertion that prayer, when it is part of opening remarks, is not a "religious exercise" under article I, section 4. The Council relies on *Thomas v. Daughters of Utah Pioneers,* 114 Utah 108, 197 P.2d 477 (1948), *cert. denied,* 336 U.S. 930, 69 S.Ct.

vote, or hold office, except as provided in this Constitution.
Utah Const. art. I, § 4.

**34.** The *Marsh* decision did not apply the three-part *Lemon* test that has been applied by the United States Supreme Court in other federal constitutional Establishment Clause cases. *See Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105,

29 L.Ed.2d 745 (1971). Rather, *Marsh* upheld the practice of the Nebraska Legislature primarily because it was a long-standing tradition in the United States, reaching back to the enactment of the federal constitution. *Marsh v. Chambers,* 463 U.S. 783, 786–91, 103 S.Ct. 3330, 3333–35, 77 L.Ed.2d 1019 (1983).

**35.** *See supra* note 1.

739, 93 L.Ed. 1090 (1949), for this proposition. There, this court held that the expenditure of state funds for construction of a pioneer museum to be run by an organization whose members were predominately Mormon did not violate article I, section 4. Because a public, nonreligious purpose for the museum was found, without any evidence of proselytizing by the organization, this court concluded that no constitutional violation had occurred. *Id.* at 128–33, 197 P.2d at 489–90.

Using *Thomas,* the City Council argues that its stated public, nonreligious purposes of providing for moments of reflection and civility, encouraging high-mindedness, recognizing cultural diversity, and fostering sensitivity remove the Council's policy from the constitutional definition of "religious exercise." [36] We do not agree. *Thomas* and our other cases interpreting article I, section 4 are quite fact-specific and offer little guidance in formulating a general analytical model for determining whether prayer is religious worship, exercise or instruction, much less when the forbidden financial support is present. *See, e.g., Manning v. Sevier County,* 30 Utah 2d 305, 517 P.2d 549, 551–52 (1973) (upholding construction of hospital despite lease to church-controlled corporation); *Gubler v. Utah State Teachers' Retirement Bd.,* 113 Utah 188, 200–01, 192 P.2d 580, 586 (1948) (upholding teachers' retirement act

despite incidental benefit to parochial school teachers).

■ With no real guidance in our case law on the question of what constitutes "religious worship, exercise or instruction," we consider the Separationists' argument that prayer, by its very nature, is religious worship or exercise. Webster's Dictionary defines prayer as "[a]n earnest request to someone (for something); an entreaty." *Webster's New International Dictionary* 1940 (2d ed. 1954). While the dictionary definition provides that prayer may be addressed to any person or body invested with power or authority, including a divinity, we note that the prayer at issue here was directed to a divinity. Such prayer seems undeniably religious. Our views echo those of the United States Court of Appeals for the Fifth Circuit:

> Prayer is perhaps the quintessential religious practice for many of the world's faiths, and it plays a significant role in the devotional lives of most religious people.
>
> . . . .
>
> Prayer is an address of entreaty, supplication, praise or thanksgiving directed to some sacred or divine spirit, being or object. That it may contemplate some wholly secular objective cannot alter the inherently religious character of the exercise.

*Karen B. v. Treen,* 653 F.2d 897, 901 (5th Cir.1981), *aff'd mem.,* 455 U.S. 913, 102 S.Ct.

**36.** The City Council supports this assertion by relying on cases interpreting the federal constitution's Establishment Clause under the United States Supreme Court's *Lemon* test, which also looks to "purpose" in its analysis. Under the *Lemon* test, for a statute or governmental act that involves religion to pass constitutional muster, it must (i) have a secular legislative purpose, (ii) have a principal or primary effect that neither advances nor inhibits religion, and (iii) not foster an excessive government entanglement with religion. *Lemon,* 403 U.S. at 612–13, 91 S.Ct. at 2111. We agree with the City Council that under this analysis, its policy would likely survive federal constitutional scrutiny. We also note that state courts applying the *Lemon* test have upheld prayer before legislative sessions and city council meetings. *See Colo v. Treasurer & Receiver General,* 378 Mass. 550, 392 N.E.2d 1195, 1201 (1979) (upholding state payment of chaplain salaries under state and federal constitutions); *Marsa v. Wernik,* 86 N.J. 232, 430 A.2d 888, 899, *appeal dismissed & cert. denied,* 454 U.S. 958, 102 S.Ct. 495, 70 L.Ed.2d 373 (1981) (finding no

violation of First Amendment by invocations at borough council meetings); *see also Lincoln v. Page,* 109 N.H. 30, 241 A.2d 799, 801 (1968) (upholding city practice of inviting clergy to open special meetings with invocation). We, however, decline to adopt the *Lemon* test as our analytical model for the Utah Constitution, which is more detailed than its federal analogue and allows less room for the rather free interpretation that the United States Supreme Court has given the federal constitution's First Amendment. Furthermore, the United States Supreme Court only devised the *Lemon* test in 1971 and appears to apply it rather opportunistically. When the Court wants to reach a result that might not flow from a *Lemon* analysis, it seems quite willing to ignore *Lemon.* Indeed, the Court's decision in *Lee v. Weisman* suggests that *Lemon* may have been all but abandoned. *See* ―― U.S. ――, ――――――, 112 S.Ct. 2649, 2660–61, 120 L.Ed.2d 467 (1992). We think it unwise to found our interpretation of the quite different Utah constitutional provision on such unstable ground.

1267, 71 L.Ed.2d 455 (1982). We conclude that the prayerful address of a deity, by its very nature, is a "religious exercise." Therefore, a religious exercise occurs at City Council meetings when prayer is given as an opening thought.

In an attempt to dissuade us from this relatively straightforward conclusion, the City Council has raised a parade-of-horribles argument. It contends that if we find prayer to be a religious exercise, similar findings would be required for a performance of "The Hallelujah Chorus" from Handel's *Messiah*, Beethoven's *Ninth Symphony*, or the singing of Christmas carols, and that such results would be fundamentally at odds with all our cultural traditions. We do not agree with the Council's premise. None of the examples cited by the Council, including the use of the phrase "In God We Trust" on our money and the reference to God in the "Pledge of Allegiance" or any other of the usages referred to, amount to "religious exercise, worship or instruction" within the meaning of article I, section 4. When a Christmas carol is sung *as part of a worship service*, it falls within the terms of the Utah Constitution. But when sung apart from a formalized worship service, on or off church property, carols are simply artistic expressions of a predominantly Christian culture. The same is true of any number of other artistic expressions that have occupied center stage in Western European civilization for more than 1500 years.

Similarly, the references to God described by the City Council are just that—references—not religious "exercise" or "worship." Again, such references might occur in a religious service, but they are not intrinsically religious worship or exercise and may fall outside these relatively narrow constitutional categories when removed from that context. Prayer, however, is unique. It is a portable, yet inherently religious, exercise. It need not occur within a group of celebrants to take on religious character, although it may arise there. One person praying, silently or aloud, alone or in a crowd, among nonbelievers or

believers, is still participating in a religious exercise. We think to hold otherwise would demean prayer and those who practice it.

Given that prayer is a religious exercise, we must address the next question: Does the City Council's practice violate the portion of article I, section 4 that states, "No public money or property shall be appropriated for or applied to any religious ... exercise"? The district court found unconstitutional the use of city facilities, equipment, resources, and employee time in support of the opening remarks portion of the Council meetings. The City Council admitted that an appropriation or application[37] of public money or property had occurred but argued that the expenditures were indirect and de minimis, therefore falling outside the constitutional proscription. The district court rejected that argument, concluding that the expenditures "represented a serious threat to constitutionally protected rights."

The Separationists support the district court's ruling but argue for an even stricter standard: They claim that the "no public money or property" language allows no exceptions for indirect or de minimis expenditures by the government for religious worship, exercise, or instruction. Under this reasoning, even if we were to conclude that the public support here was de minimis, it would still be unconstitutional.

In support of this absolutist position, the Separationists rely on the plain language of article I, section 4. Like the City Council, however, the Separationists are unable to refer us to any proceedings of the 1895 constitutional convention that shed light on the question of whether the "no public money or property" language was intended to impose an absolute bar to support of any kind. Instead, the Separationists direct us to Washington state case law construing a similar provision in that state's constitution.

Article I, section 11 of the Washington Constitution [38] is the source of the "no public

---

37. Because the City Council admits that an "appropriation" or "application" of public money or property occurred in the instant case, we do not further analyze the meaning of those terms in this opinion.

38. Article I, section 11 of the Washington Constitution provides in pertinent part, "No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious estab-

money or property" provision of our article I, section 4. The Washington courts have given this provision a very literal reading. However, we do not find Washington case law persuasive. Each of the Washington cases cited by the Separationists, as well as others we have found, involved schools or education and implicated either the separate Washington constitutional provision that schools be free from sectarian control, *see* Wash. Const. art. 9, § 4, or involved the interpretation of the phrase "religious instruction." *See Witters v. State Comm'n for the Blind,* 112 Wash.2d 363, 771 P.2d 1119, 1121–22 (en banc), *cert. denied,* 493 U.S. 850, 110 S.Ct. 147, 107 L.Ed.2d 106 (1989) (interpreting "religious instruction"); *State Higher Educ. Assis. Auth. v. Graham,* 84 Wash.2d 813, 529 P.2d 1051, 1053 (1974) (en banc) (examining both article 1, section 11, and

article 9, section 4); *Weiss v. Bruno,* 82 Wash.2d 199, 509 P.2d 973, 977 (1973) (deciding case on basis of article 9, section 4); *Calvary Bible Presbyterian Church v. Board of Regents,* 72 Wash.2d 912, 436 P.2d 189, 193 (1967) (en banc) (interpreting meaning to be given "religious instruction"); *Perry v. School Dist.,* 54 Wash.2d 886, 344 P.2d 1036, 1039 (1959) (en banc) (examining both article I, section 11, and article 9, section 4); *Visser v. Nooksack Valley Sch. Dist.,* 33 Wash.2d 699, 207 P.2d 198, 200 (1949) (en banc) (same); *Mitchell v. Consolidated Sch. Dist.,* 17 Wash.2d 61, 135 P.2d 79, 81 (1943) (same). None of these cases address the issue of appropriating public money or property for, or applying it to, a religious exercise in a noneducational setting. Therefore, we find them to be of minimal utility.[39]

lishment." Wash. Const. art. I, § 11. The framers of the Utah Constitution changed the phrase "religious establishment" to "ecclesiastical establishment." *See* Utah Const. art. I, § 4.

**39.** The Separationists also argue that Oregon case law supports their position. In *Kay v. David Douglas School District,* 79 Or.App. 384, 719 P.2d 875 (1986), *rev'd on other grounds,* 303 Or. 574, 738 P.2d 1389 (1987), *cert. denied,* 484 U.S. 1032, 108 S.Ct. 740, 98 L.Ed.2d 775 (1988), the Oregon Court of Appeals examined a religious invocation at a high school graduation under several provisions of the Oregon Constitution, including article I, section 5. That section provides:

No money shall be drawn from the treasury for the benefit of any religeous [sic] or theological institution, nor shall any money be appropriated for the payment of any religeous [sic] services in either house of the Legislative Assembly. Or. Const. art. I, § 5.

Using the United States Supreme Court's three-part *Lemon* test, adopted by the Oregon Supreme Court in *Eugene Sand & Gravel v. City of Eugene,* 276 Or. 1007, 558 P.2d 338, 346–47 (1976), the court concluded that "the purpose for which a prayer is given necessarily must be religious." *Kay,* 719 P.2d at 880. The court also indicated in dictum that there would be no de minimis exception to the constitutional provision, stating that religious invocations would be permissible in the Oregon Legislature as long as no funds were appropriated. *Id.,* 719 P.2d at 879.

We find the *Kay* decision unpersuasive. First, we note that the Oregon Supreme Court has adopted the *Lemon* test for state constitutional analysis, which we have declined to do. Even if we were applying that analysis, we think the *Kay* court misstated the law in concluding that under the *Lemon* test, prayer cannot have a secular

purpose. The Oregon Supreme Court rejected a similar conclusion when it approved of the display of a Christian cross as a veterans war memorial despite the fact that the cross was clearly a religious symbol. *Eugene Sand,* 558 P.2d at 346. The supreme court stated that the controlling question was whether the purpose of the display was religious or secular. *Id.* Because the cross was displayed as a war memorial, the court concluded that the *Lemon* test's requirement of a secular purpose had been satisfied. *Id.* Furthermore, we are unpersuaded by Oregon case law because in the cases cited to us, its courts have relied on federal constitutional analysis and have not undertaken an historical examination of their own constitution.

Even less persuasive is the California Supreme Court's treatment of its constitution, also cited by the Separationists. In *Sands v. Morongo Unified School District,* 53 Cal.3d 863, 281 Cal.Rptr. 34, 809 P.2d 809, 820–21 (1991) (en banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992), only three of seven justices found that religious invocations and benedictions at public high school graduation ceremonies violated article I, section 4 and article XVI, section 5 of the California Constitution. The state constitutional discussion is less than one page and offers little analysis. Although this case is cited by the Separationists as a majority opinion, two of the seven justices found no violation of the state constitution, and two refused to address the issue. Similarly, in *Fox v. City of Los Angeles,* 22 Cal.3d 792, 150 Cal.Rptr. 867, 587 P.2d 663, 665–66 (1978), the majority gave little analysis in upholding an injunction against Los Angeles regarding the illumination of a cross at city hall, although Chief Justice Bird did offer an historical analysis in her concurring opinion. *Id.* 150 Cal.Rptr. at 871–73, 587 P.2d at 667–69 (Bird, C.J., concurring).

We next consider the consequences of the position the Separationists advocate and conclude that an absolutist interpretation of the "no public money or property" language would produce results that almost certainly could not have been intended by the framers and that might well violate the federal constitution as it is now construed. For example, under a literal, absolutist interpretation of article I, section 4, if a prayer were to be given by any individual on government property or during a government function, some "public money or property" would be devoted to that exercise: the very ground upon which the speaker stood would be owned by the government, or the meeting at which the prayer occurred would be publicly funded. If the constitution were read to bar this activity, it would mean that while the government could allow a political group to use a public park for a rally, it could not allow a religious group to use the park for a revival. Similarly, if an open microphone and soapbox were set up outside city hall for the use of any individual who wished to speak, the government could not permit its use by those who wanted to pray, conduct an impromptu religious service, or proselytize others, but could permit neo-Nazis, the Ku Klux Klan, the John Birch Society, the Society of Separationists, or members of the Democratic or Republican Party to speak. Such a construction of our article I, section 4 would evidence an affirmative hostility toward religion, hostility that is not only inconsistent with our history as we discuss below, but also probably impermissible under the Free Exercise Clause of the First Amendment to the United States Constitution.[40] *See Widmar v. Vincent,* 454 U.S. 263, 273–76, 102 S.Ct. 269, 276–78, 70 L.Ed.2d 440 (1981). In addition, such a construction might separately implicate federal free speech rights. *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. ——, ——————, 113 S.Ct.

2141, 2146–48, 124 L.Ed.2d 352, 361–62 (1993); *Widmar,* 454 U.S. at 270, 102 S.Ct. at 274.

Having found little guidance in the cases relied on by the Separationists and much evidence to suggest that their rigid, absolutist construction of "no public money or property" is unworkable, we turn to the City Council's contention that the "no public money or property" language should be construed as applying only to non-de minimis support for religious exercise. As noted earlier, the relevant constitutional language is not helpful on this point, we have found no direct expression of intent by the framers that is of assistance, and our prior case law is silent on the issue. Consequently, to develop an analytical model for determining if and when public support for activities that might include religious exercise violates the "no public money or property" language, we resort to thematic threads running through the constitution. Our model is woven from those threads.

We first look to the constitution's text for a dominant theme that may underlie the various provisions on freedom of religion and conscience. Several provisions furnish material for this exercise. Article III, which incorporates the required ordinance from the federal Enabling Act, reads in relevant part:

> First: —Perfect toleration of religious sentiment is guaranteed. No inhabitant of this State shall ever be molested in person or property on account of his or her mode of religious worship; but polygamous or plural marriages are forever prohibited.
>
> . . . .
>
> Fourth: —The Legislature shall make laws for the establishment and maintenance of a system of public schools, which

---

**40.** The First Amendment to the United States Constitution has been made applicable to the states by the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). In interpreting the First Amendment, the United States Supreme Court has consistently said that when it comes to the expression of viewpoints, a state cannot prefer religion to non-religion, or vice versa. *Lynch v. Donnelly,* 465 U.S. 668, 673, 104 S.Ct. 1355, 1359, 79 L.Ed.2d 604 (1984); *Epperson v. Arkansas,* 393 U.S. 97, 103–04, 89 S.Ct. 266, 269–70, 21 L.Ed.2d 228 (1968); *Zorach v. Clauson,* 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952). Just as we endeavor to interpret statutes so as to uphold them as not in conflict with our state constitution, we also construe our constitution so as to uphold it under the federal constitution when reasonably possible.

shall be open to all the children of the State and be free from sectarian control.[41] Utah Const. art. III. Article I, section 1 states that all citizens have the "inherent and inalienable right ... to worship according to the dictates of their consciences." Article X, section 9 proscribes any public appropriations "for the direct support of any school or educational institution controlled by any religious organization."[42] Also relevant are the other portions of article I, section 4. We therefore again quote that provision in its entirety, setting out its separate clauses:

> [i] The rights of conscience shall never be infringed. [ii] The State shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; [iii] no religious test shall be required as a qualification for any office of public trust or for any vote at any election; [iv] nor shall any person be incompetent as a witness or juror on account of religious belief or the absence thereof. [v] There shall be no union of Church and State, nor shall any church dominate the State or interfere with its functions. [vi] No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or for the support of any ecclesiastical establishment. [vii] No property qualification shall be required of any person to vote, or hold office, except as provided in this Constitution.

Utah Const. art. I, § 4. While we recognize that portions of article I, section 4 were drawn directly from outside sources,[43] certain aspects of the provision are unique to Utah. For example, no other state constitution forbids the union of church and state or the domination or interference by any church with state functions. Smith, at 1457.

A general characterization of all these provisions, when read together, is that they are designed to protect religious exercise and freedom of conscience in general, to separate government from active financial support of religion, to prevent one religious denomination from dominating the public schools or the government itself, and to prevent the imposition of civil limitations based on one's religious beliefs or lack thereof. With these textual themes in mind, we return to the history detailed earlier for its lessons and bring text and history together in crafting an interpretation of article I, section 4.

Our survey of Utah's history leads us to some tentative conclusions about the perspective of the delegates at the constitutional convention on the issues of religion and conscience that are dealt with in the constitution. Mormon delegates likely viewed the territorial government—controlled by federally appointed non-Mormons—as oppressive. They had experienced the attempted control and suppression of their religious beliefs and practices by the federal government, often operating through territorial officials. On the other side, non-Mormon delegates had lived under social, economic, and political domination by the Mormon Church. They had experienced the oppression that can occur when one religious group has unfettered control over the political machinery of local government. Both groups of delegates could claim that some form of authority, be it federal or local, had denied them freedom of conscience, and both were acutely aware of the threat government power presented to that freedom.

We also conclude that the Mormon majority at the 1895 convention acted deliberately to distance itself from any suggestion that

---

41. Similarly, article X, section 1 also provides for public education and higher education systems that are "free from sectarian control." Utah Const. art. X, § 1. This provision was added as an amendment to the constitution on July 1, 1987.

42. We also note that the Preamble to the Utah Constitution gives thanks "to Almighty God for life and liberty."

43. The Deseret constitutions of 1849 and 1872 provided for a right of conscience; the Establish-

ment and Free Exercise Clauses of the First Amendment of the United States Constitution are repeated almost verbatim in article I, section 4. Smith, at 1457. Numerous state constitutions also provided for the prohibition on religious qualification. Id.; see, e.g., Kan. Const. Bill of Rights, § 7; Nev. Const. art. I, § 4; Wash. Const. art. I, § 11. The Washington Constitution contains a clause dealing with public appropriations that is nearly identical to the one found in article I, section 4. Smith, at 1457; see Wash. Const. art. I, § 11.

the new government of Utah could justifiably be viewed as theocratic. Having struggled for statehood for nearly fifty years, Mormons had come close to seeing the legal destruction of their church and ultimately had been forced to abandon polygamy before the federal government would consider making Utah a state. Having been seriously threatened in the prolonged confrontation with the federal government, the Church, following the Manifesto of 1890, had worked to convince Congress of the sincerity of its renunciation of polygamy and of its intent to forswear control of civil affairs. Statehood was obtained, but at a high cost.

The convention's delegates manifested a parallel intention to put behind them the struggles of the preceding half-century and to bring all Utahns together. Opening prayer was held daily during the convention, but it was offered by ministers of various denominations displaying far more diversity than chance or the heavily Mormon membership of the convention would lead one to expect. Among the denominations or groups represented were the Catholic Church, the African Methodist Episcopal Church, the Episcopal Church, the Unitarian Society, the Presbyterian Church, the Congregational Church, the Christian Endeavor Society, the Salvation Army, the Methodist Episcopal Church, the Scandinavian Methodist Episcopal Church, the Army Chaplain Corps, and the Mormon Church. One delegate even requested that the minutes of the proceedings reflect this openness:

> I find by reference to our minutes of the first day, the name of the gentleman who offered prayer and also the church with which he is associated was given [Mormon Church President George Q. Cannon], and I think this should be done in each case, the object of the mover of the motion having been *to show to the public that a freedom of religious sentiment prevailed in the Convention.*

1 *Proceedings,* at 105 (emphasis added). In short, the 1895 constitution appears to have been a coming together of adversaries ready to bury old conflicts and make common cause of their newly granted right to self-government.

Reading the text of the constitution's religion and conscience clauses in light of this history, we identify three complementary themes: (i) a distancing of government from involvement with religion, (ii) nonsectarianism to the extent there is government involvement with religion, and (iii) government neutrality—the maintenance of a level playing field in civil matters—as between religious and nonreligious sentiments. *See* Angela C. Carmella, *State Constitutional Protection of Religious Exercise: An Emerging Post–Smith Jurisprudence,* 1993 B.Y.U.L.Rev. 275, 321. These themes find expression in the "rights of conscience" and the "perfect toleration of religious liberties" language in article III's ordinance and seem to have been a natural common ground to the veterans of Utah's struggle for statehood. They also underlie the "no religious test" language of article I, section 4 banning the disqualification of jurors or witnesses for their religious views or lack thereof, as well as other specific clauses of article I, section 4.

With these themes as background, we return to the question of whether the portion of article I, section 4 providing that "[n]o public money or property shall be appropriated for or applied to any religious ... exercise" is violated by public expenditures in the form of employee time spent organizing the Council's opening remarks, some of which were prayers, and by the use of public facilities and equipment for the presentation of those remarks.

We first dispose of the City Council's suggestion that if prayer is considered a religious exercise, as we have held, we should find a de minimis exception to the "no public money or property" sentence in article I, section 4. The Council would have us hold that some direct expenditures for what is admittedly religious worship, exercise, or instruction are permitted if they are small enough. We reject this suggestion. To adopt such an approach would open the way for government to make direct and specific appropriations to defray the operating expenses of a religious group *qua* religious group, or of religious groups in general, or to make similar appropriations to pay the costs of mounting religious worship, exercise, or

instruction, whether conducted within a church building or elsewhere. Such an exception would fundamentally alter the ban of article I, section 4 by replacing the word "no" with the words "no more than the courts think reasonable." Our rejection of a de minimis exception leads to the conclusion that public expenditures or uses of property that provide any "direct" benefit to religion run afoul of the "no public money or property" ban of article I, section 4.

Our construction is not without precedent. *See, e.g., Community Council v. Jordan,* 102 Ariz. 448, 432 P.2d 460 (1967) (en banc).[44] Furthermore, the City Council's interpretation would be at odds with the constitutional themes of no direct governmental involvement with religion, governmental nonsectarianism, and neutrality toward conscientious sentiments, religious or irreligious. Finally, our history convinces us that direct expenditures for religious purposes are not to be permitted lest the old wounds of church-state entanglement be reopened.

We move to the question of whether article I, section 4 permits government money or property to be used to indirectly benefit religion. The City Council argues that to refuse to permit religion to benefit from public expenditures would be to adopt an absolutist reading of "no" public money or property. We agree. We think that a firm middle ground can be found between the positions of the Separationists and of the City Council.

The middle ground we seek rests on the concept of governmental neutrality we find underlying our constitution's religion and conscience clauses, which in this instance means neutrality in the use of public money or property. When the state is neutral, any benefit flowing to religious worship, exercise, or instruction can be fairly characterized as indirect because the benefit flows to all those who are beneficiaries of the use of government money or property, which may include, but is not limited to, those engaged in religious worship, exercise, or instruction. We

**44.** The Arizona courts have distinguished between direct and indirect appropriations in interpreting article II, section 12 of the Arizona Constitution. That article, identical to its Washington state counterpart, provides in pertinent part, "No public money or property shall be appropriated for or applied to any religious worship, exercise, or instruction, or to the support of any religious establishment." Ariz. Const. art. II, § 12.

In *Community Council v. Jordan,* 102 Ariz. 448, 432 P.2d 460, 462 (1967) (en banc), the Arizona Supreme Court ordered the state to reimburse the Salvation Army for relief expenditures it made on behalf of the state's welfare department. The State argued that such reimbursement would violate article II, section 12 of the Arizona Constitution as well as article IX, section 10, which provides, "No tax shall be laid or appropriation of public money made in aid of any church, or private or sectarian school, or any public service corporation." Ariz. Const. art. IX, § 10. The court indicated that the "support" or "aid" of a religious establishment meant "assistance in any form whatsoever which would encourage or tend to encourage the preference of one religion over another, or religion per se over no religion." 432 P.2d at 466. Although recognizing that the Salvation Army was a religious institution, the court clarified that reimbursement for "actual costs of materials given entirely to third parties of any or no faith or denomination and not to the church itself is not the type of aid prohibited by our constitution." *Id.* The fact that public money was channeled through the Salvation Army did not unconstitutionally aid

the organization, despite the fact that those receiving aid most likely realized that it came from the Salvation Army. *Id.* 432 P.2d at 463, 468. While the Arizona court focused its "direct/indirect" distinction on determining whether there had been any "support of any religious establishment," we find its analysis useful.

The court again addressed the issue in *Pratt v. Board of Regents,* 110 Ariz. 466, 520 P.2d 514, 517 (1974) (en banc). There, the court upheld the leasing of Sun Devil Stadium to the Reverend Billy Graham for religious purposes, stating:

> The State is mandated by this constitutional provision to be absolutely impartial when it comes to the question of religious preference, and public money or property may not be used to promote or favor any particular religious sect or denomination or religion generally. It does not necessarily follow, however, that the framers of Arizona's Constitution intended to entirely prohibit the use by religious groups of public ... property for religious purposes, when it is clear that such use does not infer support or favor by the State of that particular religious group.

*Id.* 520 P.2d at 516. The court noted that if the university had granted a permanent lease to Rev. Graham, the prestige of the state would be placed behind his religious views in violation of the constitution. *Id.* 520 P.2d at 517. In addition, the court noted that leasing the facility for less than the fair rental value charged others would qualify as "an appropriation or application of State property for religious purposes." *Id.*

therefore read this neutrality requirement into the "no public money or property" language of article I, section 4. So read, article I, section 4 does not require the hostility toward religion advocated by the Separationists, a position fundamentally at odds with all our history, nor does it permit the state to enter the quagmire of direct government subsidies of religious functions which the City Council's position could license. Moreover, our interpretation of article I, section 4 is within the fully consistent constitutional theme of distancing government from involvement with religion *qua* religion.

■ We now undertake to describe the analytical elements of neutrality, elements that must be present before a benefit can be found to be constitutionally indirect. Under our analytical model, use of public money or property that benefits religious worship, exercise, or instruction or any ecclesiastical establishment qualifies as an indirect benefit and survives constitutional scrutiny only if it meets two requirements.[45] First, the money or property must be provided on a nondiscriminatory basis. Some examples may be of assistance. If a city permits groups to use city-owned facilities, that use must be permitted without regard to the belief system of the user. Lutherans or Latter-day Saints who wish to use the facilities must have access on exactly the same terms as the Loyal Order of Moose, the American Atheist Society, or the Libertarian Party. The same would be true for services. The nondiscriminatory provision of police and fire protection and garbage pickup to all structures in the city are examples. Mormon chapels, Republican Party headquarters, and the A.C.L.U. offices must be able to obtain such services on terms that are not affected by the beliefs of the users.

Second, the public money or property must be equally accessible to all. Although this requirement may sound similar to the first, it has a different emphasis, one designed to ensure that the purpose of the first requirement is not subverted and the state's neutrality compromised. For example, if the services or facilities being provided are those for which demand exceeds supply, such as fewer spaces in city parks than the number of groups requesting their use, the terms of access must be such that all users have a realistically equal opportunity to receive the benefit based on criteria that are unrelated to their belief systems. In other words, the government must implement a system that awards the benefit so that each group, religious or secular, has a realistically equal opportunity for the use of the public resource. For if government allows all groups to apply for the benefit but then discriminates in the selection process, it would be preferring one group over the other in violation of the constitutional principle of neutrality.

With this analytical approach in mind, we address the City Council's policy. The first step in our analysis is determining whether public money or property has been used for religious worship, exercise, or instruction or for the support of any ecclesiastical establishment. As stated earlier, we recognize that religious exercise does occur during some of the opening remarks and that the City Council does arrange for and provide the forum for those remarks. Therefore, religious exercise receives some sort of benefit from the use of public money or property. We must next determine whether the benefit here is direct, thereby triggering the bar in article I, section 4. We think not.

In reaching this conclusion, we follow the two-step analysis of constitutional neutrality articulated above. First, we conclude that the expenditures made in connection with the arrangement for and provision of facilities for opening remarks were provided on a nondiscriminatory basis. The expenditures were not for the religious exercise itself, but for the meeting and that portion of the agenda

---

**45.** The same analysis is not necessarily true for negative expenditures. For example, although a tax exemption might run afoul of the general language of article I, section 4 because from an economic standpoint an exemption and an appropriation are hard to distinguish, another provision in our constitution explicitly provides such an exemption for property used exclusively for religious purposes. *See* Utah Const. art. XIII, § 2(2)(c). The two provisions, therefore, must be read together. *See West Valley City Corp. v. Salt Lake County*, 212 Utah 15, 852 P.2d 1000, 1004 (1993).

that consists of generic opening thoughts, some of which may include prayers. Furthermore, the Separationists have not shown that the City Council favored particular religions or religion in general in scheduling participants. To the contrary, the record indicates that the City Council made efforts to assure that a broad cross-section of the community was represented. We conclude that any use of public money or property for facilitating the giving of opening remarks was made on a nondiscriminatory basis without regard to the belief systems of the speakers. Second, the Separationists have not shown that the City Council's policy denied any group or individual a realistically equal opportunity to participate in favor of particular religious groups or speakers or of religious speakers in general. In fact, the record shows that the resource here is not one that had to be allocated; there were more opportunities in the schedule for participants to give opening remarks than there were interested speakers.

Based on the foregoing, we conclude that any benefit the City Council's use of public money or property provides to religious exercise by furnishing a forum for the expression of prayer is constitutionally indirect. As a result, the expenditures made are not within the reach of article I, section 4's language barring an "appropriat[ion]" or "appli[cation]" of "public money or property" for "religious worship, exercise or instruction" or "for the support of any ecclesiastical establishment."

■ We next address the Separationists' claims that the City Council's policy violates the command of article I, section 4 that "[t]here shall be no union of Church and State, nor shall any church dominate the State or interfere with its functions." Specifically, the Separationists argue that this clause requires an *absolute* separation of church and state, which they take to mean "religion and state." By permitting prayer, they assert, the City Council has breached that wall.

We do not agree. Referring again to our history, we conclude that the "no union of Church and State" and "no Church shall dominate or interfere" language of article I,

section 4 does not express a concept that contradicts the foundational themes of nonsectarianism and neutrality which we have found to underlie the religion and conscience provisions of our constitution. Rather, the language is a particularistic command directed at the Mormon Church as an institution and was intended to forever bar the sort of theocracy that existed in the early days of the State of Deseret by preventing that church, or any other church as an institution, from "interfer[ing]" directly in or "dominat[ing]" state government. Based on this reading, we conclude that the union-of-church-and-state ban applies only to circumstances that join a particular religious denomination and the state so that the two function in tandem on an ongoing basis. There is no evidence in the record to support a claim that such a union exists or, alternatively, that the City Council's policy could be construed as allowing one religious denomination to dominate or interfere with city business. In fact, the record indicates no preference by the City Council for any religious group or for organized religion in general. Quite the contrary, a wide variety of religious groups, as well as some secular ones, have been represented in the opening ceremony.

On a deeper level, we do not agree with the Separationists that the framers of the Utah Constitution intended a complete separation between religion and the state, if complete separation means positive hostility as the Separationists seem to contend. *See Thomas*, 114 Utah at 128–29, 197 P.2d at 488. Such a complete separation in "every and all respects" would make the state and religion "aliens to each other—hostile, suspicious, and even unfriendly." *Zorach v. Clauson*, 343 U.S. 306, 312, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952) (opinion of Douglas, J.). Such a result is clearly unnecessary to the goals of our state and federal constitutions and, as we noted earlier in rejecting the Separationists' argument for an absolutist interpretation of the "no public money or property language," is one that would produce consequences unintended by the framers and unheralded by our history. *See id.* This is a state, after all, that was settled by people with primarily

religious motivations. Our early history is of the struggle between those with deeply held views on matters of conscience, whether grounded in orthodox religion or otherwise. The state that was created by the parties to this struggle plainly was not intended to be hostile to the foundation upon which most of its creators grounded their value systems— religion. *Cf.* W. Cole Durham, Jr., & Alexander Dushku, *Traditionalism, Secularism, and the Transformative Dimension of Religious Institutions,* 1993 B.Y.U.L.Rev. 421, 422–25 (analyzing importance of diversity in matters of conscience, or religion, in maintaining communities that are essential constituents of pluralistic democracy).

We hold that the City Council's policy does not violate article I, section 4's prohibitions against the union of church and state or the domination of government by any church.

A few concluding remarks are in order by way of recapitulation. Both the City Council and the Separationists have urged us to follow cases from other jurisdictions—jurisdictions with different constitutional provisions and different histories than Utah. The Separationists advocate that we follow the approach of one group of states. The City Council proposes that we look for guidance to another and also urges upon us the United States Supreme Court's precedent in the area of legislative prayer, *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), or the Court's analytical framework developed in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

We have followed neither party's course. The federal rulings set the floor for federal constitutional protections which we must respect in interpreting the scope of our own constitution's provisions. But the federal courts have an entirely different task before them than do we. They have only a cryptic

sentence to interpret; we have paragraphs that are expressed in clearer terms and that are given even more vivid meaning by our unique and relatively recent history. The citizens of Utah know, perhaps better than those of any other state, what evils can befall people, communities, and government when religious strife is pervasive.

As for the decisions of the courts of our sister states, we have referred to them when they elucidate provisions that seem to be similar to our own. However, the basic fact remains that even when the documents are similar in language to ours, these courts take divergent approaches in construing them, a fact that is illustrative of the almost trite observation that different meanings and different nuances can be read into the same language by different courts working within different historical contexts.

Ultimately, our construction is the one most consistent with the Utah Constitution's religious and conscience provisions, read in light of the history of the religious conflict that marked the years Utah struggled to become a self-governing state.[46] Government is not to prefer religion to nonreligion, but neither should it be hostile to religion. Religious exercise is to be unfettered, and freedom of conscience is to be supreme.

In Utah, these lessons were learned at a steep price. We think that the drafters of the Utah Constitution achieved a remarkable degree of detachment from the passions that had swirled around them in the years preceding 1895, *see* Malmquist, at 159–61,[47] and wisely concluded that it was best to maintain neutrality among various religious groups as well as between those whose consciences were persuaded by religion and those whose consciences were not. That is how we leave the playing field today.

The judgment of the district court is therefore reversed, and the case is remanded with

---

46. We note that such conflict has occasionally resurfaced in the years since statehood. For example, in 1902, Reed Smoot, one of the Twelve Apostles of the Mormon Church, was elected as a United States senator. Because of his position with the church, the polygamy fight was renewed, and the old Liberal Party was revived under the name of the American Party. Malmquist, at 225.

47. Apparently, for perhaps the first time, the *Deseret News* and *The Salt Lake Tribune* agreed on an issue: The convention delegates had done a good job in drafting the Utah Constitution. Malmquist, at 161.

directions to enter judgment for the City Council.

HALL, C.J., and DURHAM, J., concur.

HOWE, Associate Chief Justice, concurring with reservation:

I concur with one reservation. The majority opinion rests on grounds other than *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). Consequently, I find it unnecessary to analyze *Marsh* and attempt to distinguish it from the instant case as does the majority. In that case, the Court recognized that "the opening of sessions of legislative and *other deliberative public bodies* with prayer is deeply embedded in the history and tradition of this country." 463 U.S. at 786, 103 S.Ct. at 3333, 77 L.Ed.2d at 1024 (emphasis added). The City Council here is a "deliberative body," a legislative body. In my opinion, public participation in the state legislature, particularly through its committees, is just as intense as it is on the local level in city councils. Arguably, it is immaterial that Salt Lake City did not have prayer in its commission meetings from 1911 to 1979 because any newly formed state or city should be able to draw upon the history and tradition recognized in *Marsh.*

Thus, I prefer to reserve my judgment on the application of *Marsh* to the facts here presented. It is unnecessary for us to analyze and attempt to distinguish *Marsh* because we dispose of the case on other adequate grounds.

STEWART, Justice, dissenting:

I dissent. The majority, in a decision unparalleled in Utah jurisprudence, refuses to enforce the plain meaning of Article I, section 4 of the Utah Constitution and instead rewrites that provision to reach a result directly contrary to the unambiguous language and intent of that provision.[1]

I.

Article I, section 4 of the Utah Constitution states (bracketed numbers are added for ease of reference to specific provisions therein):

The rights of conscience shall never be infringed. [1] *The State shall make no law respecting an establishment of religion or prohibiting the free exercise thereof;* no religious test shall be required as a qualification for any office of public trust or for any vote at any election; nor shall any person be incompetent as a witness or juror on account of religious belief or the absence thereof. [2] *There shall be no union of Church and State, nor shall any church dominate the State, or interfere with its functions.* [3] *No public money or property shall be appropriated for* or applied to *any religious* worship, *exercise* or instruction, or for the support of any ecclesiastical establishment. No property qualification shall be required of any person to vote or hold office, except as provided in this Constitution.

(Emphasis added.) The critical language is "No public money ... shall be appropriated for ... any religious ... exercise."

Article I, section 4 provides greater clarity and specificity in protecting religious freedom in this state than do the religion clauses in the United States Constitution. When Utah became a state, the First Amendment did not apply to the states. Indeed, the Framers of the United States Constitution contemplated that state constitutions, rather than the federal constitution, would provide the legal basis for protecting civil liberties from invasion by state action. The Framers of the Utah Constitution, most of whom were devoutly religious, were particularly concerned with providing effective protection for freedom of religion, especially with respect to the separation of church and state, in light of the overwhelming influence of the predominant church. The Framers no doubt recognized that freedom of religion was an indivisi-

1. Although the majority opinion addresses a wide range of issues under Article I, section 4 of the Utah Constitution in dictum, the issue before the Court is narrow: Whether the City can expend public funds to establish a systematic program for providing formal prayers at official meetings of the Salt Lake City Council. This case does not involve the constitutionality of school prayers, graduation prayers, or prayers offered in sessions of the Utah Legislature. As far as I am aware, no public monies are appropriated for such purposes.

ble right and that the prohibitions on the establishment of religion and the guarantee of the free exercise of religion were not two different rights, but separate ways of ensuring the fundamental right of freedom of religion. Thus, in writing Article I, section 4, the Framers sought to make clear the line that should separate church and state. That line was especially important in this state because of the unique issues of church-state relationships that existed in the territory and, indeed, that continue to exist to a considerable extent today. Because the broad establishment clause language taken from the First Amendment to the United States Constitution was vague, the drafters of the Utah Constitution provided additional, more specific provisions to prevent state power and influence from being used to establish or further the interest of any or all religious denominations.

The language in section 4 following "[1]" in the text set out above adopts verbatim the establishment and the free exercise language of the First Amendment. The language following "[2]" is not found in the First Amendment but was deemed appropriate given the unique circumstances in the state. It prohibits the union of church and state and prohibits any church from dominating the state or interfering with its function. The language following "[3]" provides that "no public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or for the support of any ecclesiastical establishment." That language makes specific that public money and property shall not be used for the purpose of establishing any one or all religious groups.

The Framers of the Utah Constitution, most of whom were Mormon, well knew that they dealt with a society unique in the United States in its religious character. They also knew from the Mormon experience in Ohio, Missouri, Illinois, and elsewhere that freedom of religion was not easily protected from invasions by those who, in presuming to act in defense of their own religion and pursuant to divine sanction, as they supposed, suppressed the religious freedom of others. With that background, and with knowledge of the intense criticism and concern that the

United States Congress and minority groups in the Utah Territory had for the political power of the predominant church, the Framers undertook to guarantee freedom of religion and conscience (even of nonbelievers) with specificity and particularity. It was because of the greater protection afforded freedom of religion to citizens of this state that Justices Crockett, Ellett, and Henriod, who earlier sat on this Court, expressed the view that the language in Article I, section 4 of the Utah Constitution was superior to the Establishment Clause of the First Amendment. *Manning v. Sevier County*, 30 Utah 2d 305, 310, 517 P.2d 549, 552–53 (1973) (Crockett, J., concurring with Ellett, J., and Henriod, J., concurring in Justice Crockett's opinion). I believe they were correct.

In construing section 4, it is important to recognize that the anti-establishment provisions in the Utah Constitution and the free exercise provision do not protect two different rights; they protect one fundamental right, although both provisions are essential to accomplish the purpose. There is, unfortunately, a pervasive misconception in society generally, and in the majority opinion specifically, that the anti-establishment provisions are somehow hostile to religion. That is not true. While it is true that devout people often want government institutions to reflect the symbols of their deeply held views and commitments and, indeed, to reflect the deep Judeo–Christian roots that have nourished this nation and state, it is nonetheless the case that the constitutional guarantees of freedom of religion, by enforcing a strict boundary between church and state, have made America the most amenable of all nations to religious freedom and, not coincidentally, one of the most religious nations in the world. Indeed, it is my view that in those countries where one or several religious denominations are established, religion is a much less vital force in the lives of the people. Coopting the state to promote religion is inimical to the state, to religion generally, and to all citizens, believers and nonbelievers alike.

Recently, the United States Supreme Court addressed the importance of the Establishment Clause in protecting religious freedom and its relationship to the Free Ex-

ercise Clause of the First Amendment. In *Lee v. Weisman,* —— U.S. ——, ——, 112 S.Ct. 2649, 2657–58, 120 L.Ed.2d 467, 483 (1992), the Court stated:

> The First Amendment protects speech and religion by quite different mechanisms. Speech is protected by insuring its full expression even when the government participates, for the very object of some of our most important speech is to persuade the government to adopt an idea as [its] own. The method for protecting freedom of worship and freedom of conscience in religious matters is quite the reverse. In religious debate or expression the government is not a prime participant, for the Framers deemed religious establishment antithetical to the freedom of all. The Free Exercise Clause embraces a freedom of conscience and worship that has close parallels in the speech provisions of the First Amendment, but the Establishment Clause is a specific prohibition on forms of state intervention in religious affairs with no precise counterpart in the speech provisions. The explanation lies in *the lesson of history that was and is the inspiration for the Establishment Clause, the lesson that in the hands of government what might begin as a tolerant expression of religious views may end in a policy to indoctrinate and coerce.*

(Emphasis added; citations omitted.) The danger that tolerant expression of religious views by the state "may end in a policy to indoctrinate and coerce" becomes greater as the dominance of one religious group increases.

Thomas Jefferson, the great sage of American religious freedom, understood, perhaps better than any other, the exigent necessity of preventing the entanglement of government and religious denominations, if freedom of religion was to be a reality. The principles articulated in Article I, section 4 are rooted in and ultimately derived from the principles espoused by Jefferson in his historic Bill for Establishing Religious Freedom in Virginia. That bill, which subsequently served as a basis for the First Amendment Religion Clause, stated:

> Almighty God hath created the mind free.... *[T]o compel a man to furnish contributions of money for the propagation of opinions which he disbelieves in and abhors, is sinful and tyrannical....* [T]ruth is great and will prevail if left to herself.

Nathan Schachner, *Thomas Jefferson: A Biography* 159–60 (1957) (emphasis added).

Those who opposed the Bill for Religious Freedom and the disestablishment of the Anglican Church adopted the cynical but appealing tactic of arguing that to avoid "hostility" to religion, *all* Christian churches, except the Catholic church, should be established and receive state monetary support. Nathan Schachner, a biographer of Thomas Jefferson, wrote:

> [The opponents] now insisted, with but few honorable exceptions like the Baptists, that *all* Christian churches be considered as established and entitled to support; that toleration be extended only to those believing in "one God, and a future State of rewards and punishments;" and that every freeholder and possessor of tithables be compelled to enroll and declare to which of the established churches he chose to contribute. Not even the Roman Catholic Church would have come within the definition.

*Id.* at 160.

Today, a majority of this Court argues, not unlike those who opposed the disestablishment in Virginia, that the state may, contrary to the express language of Article I, section 4[3], use public money for promoting religious worship, exercise, and instruction if it is neutral as between religions in doing so. That is precisely the same argument that was urged against Jefferson's bill for religious toleration and that, fortunately for this country, was rejected.

## II.

The exact language in Article I, section 4 that controls the issue in this case is "*No public money or property shall be appropriated for or applied to any religious ... exercise.*" (Emphasis added.) The majority concedes, as it must, that Salt Lake City uses city funds to pay employees to supervise, monitor, and even, in effect, censor prayers

by providing guidelines for what is not acceptable, such as proselytizing—a restriction that might well be highly offensive to a Jehovah's Witness, for example. Indeed, a city employee was designated to recruit representatives of various faiths to attend Council meetings and offer prayers.[2] While the City's effort was laudable insofar as it sought the participation of a number of denominations, that does not mitigate the undisputable entanglement of religion and government and the use of tax funds to accomplish a religious purpose.[3] That difficulty has long been a central concern of establishment cases, *see Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), in part because it so often gives rise to unseemly, divisive sectarian struggles for greater influence in governmental practices.

The majority also admits that the City's sponsorship of prayer is sponsorship of "a religious exercise" as that term is used in section 4. And the majority admits that "public money" is "appropriated" for that purpose. Indeed, the majority concedes that the City's use of funds for the sponsorship of prayer is not *de minimus*. As the majority recognizes, such an exception would "fundamentally alter the ban of Article I, section 4 by replacing the word 'no' with the words 'no more than the courts think reasonable.'"[4] I agree that prayer is a "religious exercise" and that the City Council's use of funds to finance the practice of opening council meetings with prayer is not a "*de minimis*" exception to the "no public money" language. The inevitable conclusion that follows from those concessions and the plain language of section 4 is that the City Council's program

for establishing prayers is unconstitutional, and the majority does not deny that.

The majority refuses, however, to enforce the plain and unambiguous meaning of section 4, despite its sworn duty to uphold the language of the constitution. The Court not only shrinks from its duty, but, worse, it ascribes a completely contrary meaning to section 4 under the guise of a constitutional "interpretation" that it argues is necessary to avoid "hostility" toward religion. The majority argues that "our analysis should [not] be limited to the literal reading of two sentences of that provision (i.e., section 4), particularly when ... such a literal reading produces practical consequences that seem at odds with other provisions in the constitution."

The majority is flatly wrong; other provisions in the constitution are not at odds with section 4, and the majority fails to prove that proposition. The Court also seeks to justify its abandonment of the plain language of the constitution on the ground that "to refuse to permit religion to benefit from public expenditures would be to adopt an *absolutist* reading of 'no' public money or property." (Emphasis added.) Thus, according to the Court, to say that the word "no" in the constitution means "no" is to take an unacceptable "absolutist" position, a position from which the Framers did not shrink.

Having decided that the word "no" does not mean "no," the majority rewrites the constitution in favor of a so-called "middle ground" by concocting a distinction between public expenditures and uses of property that provide a "direct" benefit to religion and

---

2. The trial court ruled:

The inclusion of prayers in City Council meetings results in expenditure of public funds, assets and resources of Salt Lake City Corporation. City facilities (meeting rooms, etc.), City equipment (microphones, podiums, stages, etc.), City resources (electricity, printing of programs, etc.), and City employees' time (in supervising, attending, etc.), are used and expended in programming, witnessing and/or reciting said prayers. Said funds, assets and resources of Salt Lake City Corporation are utilized to aid in the recitation of said prayers with the knowledge, approval, concurrence and ratification of the defendants.

3. At least two, and perhaps three, council members stated publicly that the asserted secular pur-

pose of the city ordinance was false and that prayers were in part offered for religious purposes.

4. Having rejected the *de minimus* exception on the ground stated, it is acutely ironic that the Court adopts in lieu thereof a "direct-indirect analysis" that leads to the conclusion that public money may in fact be used for religious worship or exercises. In truth, the determination of what is direct and what is indirect will be nothing more than what the courts think reasonable. In any event, I would fear less the adoption of a *de minimus* exception than I do a wholesale rewriting of the constitutional language at issue.

those that provide only an "indirect" benefit. This contrived "middle ground" is devised, so the Court unblushingly states, to avoid the "hostility toward religion . . . which is fundamentally at odds with all our history."

To assert that the plain language of Article I, section 4 is hostile to religion demonstrates a fundamental misunderstanding of the doctrine of separation of church and state as it was intended to apply in Utah and of the purpose and effect of Article I, section 4. Beyond that, the Court's asserted examples of "hostility" are simply contrived and would not, in fact, occur under a proper reading of section 4.

The language of section 4 precludes public expenditures for "any religious worship, exercise or instruction." For the majority to assert that that language would not allow religion to benefit "from [any] public expenditures" is absurd. Asserting such an erroneous argument and extreme position appears to be for the purpose of making the departure from the language of section 4 seem justified. Section 4 simply and plainly does not prohibit religion from benefiting in general from public expenditures or public property, as do all other entities and persons. This Court has never construed section 4 in a fashion that supports the majority's *in terrorem* argument. Doing so would clearly run afoul of not only the language of section 4, but also numerous other constitutional provisions, both state and federal. It is simply wrong that section 4, read literally, would prohibit government from allowing religion to benefit from general public expenditures and property used by the public. The Court's "governmental neutrality" among religions in the use of "public money or property" for purposes other than religious worship, exercises, or instruction adds nothing to what the law is now and always has been.

The plain language of section 4 cannot reasonably be read to provide that religious denominations cannot benefit from public safety and fire protection, public parks, roads, and utilities, or other government properties established for furthering the health, safety, and welfare of the public generally. *See Manning v. Sevier County*, 30 Utah 2d 305, 309–10, 517 P.2d 549, 552 (1973). Nor does section 4, reasonably construed, bar any religious group from using a public park that is open to the public generally, or from using a microphone or soapbox outside city hall to speak on political or social issues.

The literal language of section 4 requires the Court to look to the purpose for which tax money and government property are used. Only government appropriations for worship, religious exercises, and instruction are banned, as is the exclusive use of government property for such practices. *Pratt v. Arizona Board of Regents*, 110 Ariz. 466, 520 P.2d 514 (1974) (en banc). Government property available to the public generally is available for religious activities within appropriate limitations that make clear that government is not a sponsor of such activities. *Id.; see also Manning v. Sevier County*, 30 Utah 2d 305, 517 P.2d 549 (1973); *Thomas v. Daughters of Utah Pioneers*, 114 Utah 108, 197 P.2d 477 (1948), *cert. denied*, 336 U.S. 930, 69 S.Ct. 739, 93 L.Ed. 1090 (1949); *Gubler v. Utah State Teachers' Retirement Bd.*, 113 Utah 188, 192 P.2d 580 (1948).

This Court on numerous occasions has adhered to an interpretation of section 4 that belies the majority's argument that public monies and property cannot be used for religions when the purpose is not to further religious worship, exercises, or instruction. For example, in *Thomas v. Daughters of Utah Pioneers*, 114 Utah 108, 197 P.2d 477 (1948), *cert. denied*, 336 U.S. 930, 69 S.Ct. 739, 93 L.Ed. 1090 (1949), the Court held that the construction of the Daughters of Utah Pioneers Museum with state funds did not violate Article I, section 4. The Court asked whether the construction of the museum would amount to religious exercise, worship, or instruction. The Court found no evidence of any such action and determined that before it could find violation of the Utah Constitution, it would need to find "proof of overt acts of proselytizing." *Id.* 197 P.2d at 489. And in *Manning v. Sevier County*, 30 Utah 2d 305, 517 P.2d 549 (1973), the Court upheld the use of public funds to construct a hospital which was to be leased and operated

by a church-owned corporation. Once again, the Court held that there was no violation of Article I, section 4 because there would be no religious domination, no proselytizing, or any other activities that could be characterized as religious exercise, worship, or instruction. *See also Gubler v. Utah State Teachers' Retirement Board,* 113 Utah 188, 192 P.2d 580 (1948). In short, the "absurd results" posited by the majority as a basis for not applying the language of section 4 rest on an entirely contrived and erroneous interpretation of that section.

The majority also incorrectly asserts that its direct-indirect test is supported by *Pratt v. Arizona Board of Regents,* 110 Ariz. 466, 520 P.2d 514 (1974) (en banc). It is not. *Pratt* dealt with language in the Arizona Constitution that is exactly the same as the language at issue in section 4.[5] The Arizona Supreme Court construed that language, consistent with our prior cases, to allow a state university to lease its stadium to the Reverend Billy Graham for a religious purpose. *Pratt* held that the Arizona Constitution did not prohibit the use of public property by religious groups for religious purposes so long as the use did not interfere with state functions or imply state support or favor of a particular religious group. The court held that when the state makes its property available for use or rental by the public generally, the state could lease its property at the going rate to the Reverend Billy Graham for his own purposes. The transaction was a "straight commercial transaction" and nothing more. *Id.* 520 P.2d at 517.[6] Not only does *Pratt* not support the majority's direct-indirect test, but it makes clear that the language in section 4 would not create the

hostility between church and state that the majority claims would occur if section 4 were given its plain meaning.

The Court's deletion of the word "no" from the "no public money or property" for "religious worship, exercise or instruction" language in Article I, section 4 seriously undermines the non-establishment provisions of the Utah Constitution. The majority's position now allows public money and property to be used for religious worship, exercises, and instruction for all religions. That is a stunning and revolutionary change in the meaning of Article I, section 4 and the law governing church-state relationships. Pursuant to the majority's position, the citizens of the state of Utah may now be taxed to support religious worship, exercises, and education, just as the citizens of Salt Lake are now taxed to support prayers at city council meetings, so long as the funding is available to all religious denominations. If, for example, the churches in this state, or one of them, were to prevail upon the Legislature or a local unit of government to fund sectarian religious instruction in the schools or to fund public houses of worship, that would fit within the majority's construction of section 4.[7]

The Framers of the Utah Constitution acted with a wisdom that reflected the conditions in this state and with a deep concern for preventing the state from interfering with churches and vice versa. They well knew that the inalienable right of freedom of religion and conscience could easily be eroded by well-meaning people who fervently believe that the truths that provide guidance and ultimate meaning in their lives ought to be promoted by the State, especially when they

---

5. Section 12 of the Arizona Constitution provides:

   Section 12 ... [n]o public money or property shall be appropriated for or applied to any religious worship, exercise, or instruction, or to the support of any religious establishment....

6. In *Pratt,* the court stated:

   We believe that the framers of the Arizona Constitution intended by this section to prohibit the use of the power and the prestige of the State or any of its agencies for the support or favor of one religion over another, or of religion over nonreligion. The State is mandated by this constitutional provision to be absolutely

impartial when it comes to the question of religious preference, and public money or property may not be used to promote or favor any public religious sect or denomination or religion generally.

7. Article X, section 9 bans the state and its subdivisions from making "any appropriation for the direct support of any school or educational institution controlled by any religious organization." That provision does not prohibit public funding of sectarian religious instruction in public schools. Article I, section 4, correctly read, would seem to do that.

are in the majority and it is their beliefs that would be espoused by the State. For such people, it is altogether natural, in one sense, for them to think that the State should do what they deem consistent with God's will. But in a pluralistic society, other people, equally committed and equally fervent, will inevitably disagree, and they will perceive God's will to be quite different. Still others, who are nonbelievers, will insist that the State ought not violate their right not to believe at all. Therein lie the seeds of contention, disharmony, and indeed, the violation of the right of freedom of religion and conscience. The Utah Constitution sought to avoid those consequences. Today, the Court opens wide the door to such contention and strife, especially in smaller communities throughout the state where one religion may overwhelmingly predominate and where people think that freedom of religion is a matter of majoritarian rule, not an inalienable right not subject to the beliefs and prejudices of the majority.

Today, the Court by its rewriting of Article I, section 4, sanctions a serious and highly regrettable erosion of freedom of religion.